## Hammonds v. Central Kentucky Natural Gas Co.

(Decided May 22, 1934.)

686

LeWRIGHT BROWNING, W. C. HAMILTON and H. D. KREMER for appellant.

D. L. HAZELRIGG and W. B. WHITE for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The case seems to be one of first impression. About 1919 the appellee exhausted the gas from a field of about 15,000 acres in Menifee and adjoining counties, most of which it had under lease. Thereafter it brought in vast quantities of gas from distant fields and put it by force through its previously drilled wells into the vacated underground reservoir, withdrawing it as desired. In recent rate litigation the company valued these holdings at $2,000,000. See Central Kentucky Natural Gas Company v. Railroad Commission (D. C.) 60 F. (2d) 137. The appellant owns 54 acres within this boundary which was never leased to the company. It is not disputed that this geological dome or basin underlies her land. She brought this suit to recover a large sum for use and occupation under the idea of trespass, it being charged that the gas was placed in or under her property without her knowledge or consent. Judgment went for the defendant. The decision must rest upon the character and nature of property in natural gas.

The migratory trait of oil and gas when released from imprisonment in their natural geological reservoirs by decrease of the pressure which confines them when the strata is penetrated, naturally or mechanically—perhaps at a point far removed and where no connection could be suspected—was early judicially recognized. This power, as it were, of self-transmission, or this fleeting nature of oil and gas, soon gave rise to the distinctive rules of law which differentiate these substances from the solid minerals.

In the pioneer case of Hail v. Reed, 54 Ky. (15 B. Mon.) 479 (decided in 1854), suit was filed to recover possession of "three barrels of American oil," valued at $1.25 a gallon, which had been drawn from the plaintiff's salt well in Cumberland county without his license

or permission. In the argument the plaintiffs likened the oil to solid minerals, while the defendants suggested the analogies between animals feræ naturæ and waters of a spring to oil (then a novel product sold as a medicine, and stated by the court to be "a peculiar liquid not necessary nor indeed suitable for the common use of man"), and maintained that since the plaintiff had not reduced the oil to possession and as they had done so through their own efforts, they were entitled to retain it. The court passed over the suggested analogies and held that, like water collected, the oil actually in the well, there subject to being taken out, was the property of the owner of the land and belonged to him when drawn out unless it had been done by his licensee. The defendants were regarded as wrongdoers and the oil was restored to the owner of the land. It remained for the Supreme Court of Pennsylvania twelve years later to point out specifically for the first time the distinctions and to lay the predicate for the various rules based upon the fugacious nature of these minerals in Funk v. Haldeman, 53 Pa. 229. In Westmoreland & Cambria Natural Gas Company v. De Witt, 130 Pa. 235, 18 A. 724, 725, 5 L. R. A. 73, that court said:

"Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals feræ naturæ. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract was uncertain.' * * * They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas."

But, as is pointed out in Mills & Willingham on the Law of Oil and Gas, sec. 13, the doctrine of feræ naturæ was not carried to its logical conclusion in that state (as it was in Indiana), for Pennsylvania, as in a majority of the oil producing states, has adopted the rule that the owner of land under which oil and gas lie is the absolute owner of them in place in the same manner and to the same extent as is an owner of solid minerals, and

that he may create by grant or reservation a separate corporeal estate in oil and gas identical in nature with the estate of the surface, subject, of course, to loss through escape. We so regard it in Kentucky. Willis's Thornton on Oil & Gas, secs. 34, 46, 82, 86, and 472; Hail v. Reed, supra; Scott v. Laws, 185 Ky. 440, 215 S. W. 81, 13 A. L. R. 369; Hudson & Collins v. McGuire, 188 Ky. 712, 223 S. W. 1101, 1102, 17 A. L. R. 148; Imperial Elkhorn Coal Co. v. Webb, 190 Ky. 41, 225 S. W. 1077; Trimble v. Kentucky River Coal Corporation, 235 Ky. 301, 31 S. W. (2d) 367; Piney Oil & Gas Company v. Allen, 235 Ky. 767, 32 S. W. (2d) 325; Swiss Oil Corp. v. Hupp, 253 Ky. 552, 69 S. W. (2d) 1037. Except the easement to explore and develop, the conveyance is in reality the grant of a right in real estate yet to be actually severed or produced, for as to oil and gas not discovered or produced, there is no change of title from the common ownership. Kelly v. Keys, 213 Pa. 295, 62 A. 911, 110 Am. St. Rep. 547; Swiss Oil Corporation v. Hupp, supra.

The conception of absolute ownership can go no further, for beyond that point the wild and migratory nature of oil and gas destroys the theory. They may be here today and gone tomorrow. They belong to the owner of the land as a part of it so long as they are on it or subject to his control; when they are gone, his title is gone. Brown v. Spilman, 155 U. S. 665, 15 S. Ct. 245, 39 L. Ed. 304. If they escape into the land of another, they become his property in like degree or manner. So it is declared that oil and gas are not the property of any one until reduced to actual possession by extraction, although by virtue of his proprietorship the owner of the surface, or his grantee of the severed mineral estate, has the exclusive right of seeking to acquire and of appropriating the oil and gas directly beneath. This theory of ownership or, perhaps more accurately speaking, lack of ownership is practically universally recognized. Willis's Thornton on Oil & Gas, secs. 34, 35, and 43; Ohio Oil Company v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; Walls v. Midland Carbon Company, 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276; Louisville Gas Company v. Kentucky Heating Company, 117 Ky. 71, 77 S. W. 368, 25 Ky. Law Rep. 1221, 70 L. R. A. 558, 111 Am. St. Rep. 225, 4 Ann. Cas. 355; Id., 132 Ky. 435, 111 S. W. 374, 33 Ky. Law Rep. 912; Palmer Corporation v. Collins, 214 Ky. 838, 284 S. W. 95; Gray-Mellon Oil Company v. Fair-

child, 219 Ky. 143, 292 S. W. 743; Trimble v. Kentucky River Coal Corporation, supra.

When gas is thus severed and brought under dominion and into actual possession at the surface, it, of course, becomes the personal property of the one who has extracted it under a right so to do. Willis's Thornton on Oil & Gas, secs. 50 and 60. The appellee acquired such title to the gas here involved. The question is whether that gas, having once been reduced to possession and absolute ownership having vested, was restored to its original wild and natural status by being replaced in a similar reservoir of nature, taking the place of other gas which once occupied that same subterranean chamber.

Of interest, though of little value as direct authority because a different legal question was presented, is United Carbon Company v. Campbellsville Gas Company, 230 Ky. 275, 18 S. W. (2d) 1110, where one company had brought gas from another field and placed it in storage under ground where the natural flow of gas from wells drilled in that field had become weak and then increased the flow for consumption by pumping. An adjacent lessee was denied an injunction against the pumping sought upon the ground that the storing company was taking its gas or decreasing the natural flow from its wells.

In seeking for an analogous condition in the law, the courts, since the early Pennsylvania case, have compared natural gas and oil to that of animals feræ naturæ. The analogy, as we have seen, formed the basis of the all but universal doctrine of property in these wandering minerals. So we may look to that analogous law. From the beginning, wild animals have been regarded as quasi property of the entire human race. It is the recognition of land titles rather than of any individual property in the game that prevents its pursuit, and, barring all questions of trespass, exclusive property in birds and wild animals becomes vested in the person capturing or reducing them to possession. But unless killed, this is a qualified property, for when restored to their natural wild and free state, the dominion and individual proprietorship of any person over them is at an end and they resume their status as common property. 3 C. J. 18, 19. So, too, are fish collective property so long as they remain unconfined in their natural element in a public stream, and not even the

owner of the soil over which the stream flows owns the fish therein, although he may have the exclusive right of fishing in the stream where it runs over his land. And, as in the case of wild game, a qualified property in an individual may be acquired by catching and confining fish within a private pond so they cannot escape. If, however, the fish escape and are found at large in their proper element, they again become public property and are subject to appropriation by the first person who takes them. 26 C. J. 597.

If one capture a fox in a forest and turn it loose in another, or if he catch a fish and put it back in the stream at another point, has he not done with that migratory, common property just what the appellee has done with the gas in this case? Did the company not lose its exclusive property in the gas when it restored the substance to its natural habitat?

Another analogue to the moving deposits of oil and gas is subterranean and percolating water which also have a similarity of relation though not of identity, the substantial difference being only that oil and gas are vanishing products while water may be perpetually supplied by nature. One may draw water and it becomes his when placed in his own receptacle. He may appropriate water from a running stream to turn his mill or to irrigate his land and the property therein may be said to exist in him so long as it remains under his control. But once the water is restored to the earth or to the running stream that exclusive, individual title is lost. Willis's Thornton on Oil & Gas, sec. 42; Hail v. Reed, supra; Rock Creek Ditch & Flume Company v. Miller, 93 Mont. 247, 17 P. (2d) 1074, 89 A. L. R. 200.

In his revision of Thornton's Work on Oil and Gas, Judge Willis probably had this identical situation in mind when writing section 1264 concerning the taxation of oil and gas. It is there said:

"When oil and gas are restored to the land they become a part of the real estate and taxable as such. One company owns an entire gas field in central Kentucky. It has for years stored natural gas therein and the question is suggested as to the character of the gas in such circumstances. It differs from ordinary storage in artificial containers. The gas is put back under pressure into the natural

reservoirs and assumes again its original character as part of the realty. It plainly should be taxed with and as a part of the land. It is analogous to the law concerning timber. Standing in the woods, timber is a part of the land. When severed it becomes personal property. If made into lumber and used to construct a building it becomes again a part of the land to which it is attached. When gas is stored in the natural reservoir it is subject to all the properties that inhered in it originally. A neighbor could take it with impunity through adjacent wells, if he owned land within the radius of the reservoir. Hence, it should be taxed only as part of the land in which it is placed, and in such circumstances could not be treated as personal property.''

We are of opinion, therefore, that if in fact the gas turned loose in the earth wandered into the plaintiff's land, the defendant is not liable to her for the value of the use of her property, for the company ceased to be the exclusive owner of the whole of the gas—it again became mineral feræ naturæ.

Accordingly, the judgment is affirmed.