## New Home Sewing Machine Company v. J. M. Milner's Son.

(Decided Dec. 7, 1934.)

M. HARGETT for appellant.
M. J. HENNESSEY for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The New Home Sewing Machine Company sued T. E. Milner (doing business as J. M. Milner's Son) upon seven notes of $380 each, with interest from August 1, 1927, and for $1,303.50, with interest from December 10, 1927, alleged to be due upon sale of certain leases. Milner denied all liability to the sewing machine company, sought a cancellation of all these obligations, and to recover of it $675.72 upon a counterclaim. The cause was transferred to equity, and after preparation and hearing the court gave plaintiff a judgment for $450.58, with interest from October 10, 1927. It has appealed, and Milner has prosecuted a cross-appeal.

On April 13, 1927, the defendant signed a typewritten contract with one J. D. Morrow, by which Morrow agreed to furnish defendant one or more salesmen to assist defendant in selling at retail 20 New Home sewing machines, for which defendant on that day signed an order addressed to the plaintiff and made out by filling blanks in a printed form. In this printed order blank immediately above the signature line upon which defendant signed there appears this:

"It is understood that no conditions agreed to by any salesmen or agent and not embodied herein will be in any way binding on the New Home Sewing Machine Company, and it is understood and agreed that the New Home Sewing Machine Company shall not be in any way liable under any separate or collateral agreement made between the undersigned and its salesman."

This order was in due course of time accepted and filled by the plaintiff.

Morrow soon disposed of these 20 machines by placing them with parties who signed certain lease contracts therefor which were turned over to defendant, and these contracts the defendant later assigned to the sewing machine company, and one of these assignments is copied here:

"Dated August 6, 1927. For value received I [we] hereby assign all our right, title and interest in the within contract to the New Home Sewing Machine Co., its successors and assigns.

"J. M. Milner's Son
"T. E. Milner

"Witness: W. H. Rankins."

Defendant would have made a very nice profit on each of these machines if the purchasers thereof had paid for them as and when agreed in the lease contracts which they signed when the machines were left with them. When Morrow came to Augusta to sell the first 20 machines, the territory was fresh, certain trade expansion activities were engaged in, one machine was given away on the first day of the campaign, and it looked like the machines would sell readily and rapidly, and, under the encouragement of Morrow and the prospective profits, the defendant ordered 59 additional machines, so that ere long the account between Milner and the sewing machine company stood as follows:

(a) May 27—Net cash item.....................$ 13.49
(b) May 31—Net cash item.....................   .45
(c) June 30—Net cash item....................  5.96
(d) July 5—Net cash item..................... 51.93
(e) Apr. 22—10 machines shipped............. 445.00
(f) Apr. 23—10 machines shipped............. 438.00
(g) May 31—25 machines shipped............. 1082.50
(h) June 13—10 machines shipped............. 445.00
(i) June 13—1 machine shipped from Kansas.  43.30
(j) June 27—20 machines shipped............ 866.00
(k) June 28—3 machines shipped from Dayton, Ky. ................................. 140.50

Morrow and the agents he brought or sent to Augusta were to receive from defendant certain commissions on the machines they sold, and these commissions and certain cash advanced these agents make the basis of the defendant's $675.72 counterclaim.

It was the contention of Milner, as developed by his pleadings and proof, that he was induced to order the 59 machines ordered after the first 20, because Morrow and the agents which he sent into this territory to assist Milner in the sale of the first 20 machines and the other machines later ordered had represented to Milner that these 20 machines, as well as those subsequently ordered from time to time, had been sold to bona fide purchasers, and that valid lease contracts where the machines had not been paid for in cash had been obtained from the prospective purchasers; whereas, and in truth, such machines had not been so sold and valid lease contracts had not been obtained from the respective purchasers, and that he (Milner) would not have ordered from time to time the other machines after the first 20 had he

known the truth. The proof establishes that at least in one or two instances, if not more, the machines had been left with individuals who had not purchased them or signed contracts for them. The record does not satisfactorily disclose how many of these machines were sold on valid contracts to purchasers and how many are yet in the hands of the purchasers under such valid sales contract. Without going into such detail as would make this opinion unduly long, we are of opinion that the evidence does establish that Milner was induced to order these 59 additional machines because of the representations which he claimed had been made to him as to the disposition of the first 20 machines, and that these representations were not true. On this, it is Milner's claim that he is entitled to a cancellation of all the contracts he entered into with the plaintiff, together with a recovery on his counterclaim for the commissions and cash advanced the agents sent in by Morrow to help dispose of the machines he bought. Of course, as to the first 20 machines, this contention cannot be upheld, since Milner bought these without any representation as to their having been disposed of. He must pay for these 20 machines, or make good his guaranty on lease contracts given for them and assigned by him in settlement of his obligation to pay for the same. It would be impossible in the present state of affairs to place these parties in statu quo as to the 59 additional machines, because some of them were sold for cash and some under valid installment contracts, and the machines so sold are yet in the hands of purchasers who are entitled to their possession. As to such machines so sold, Milner cannot be hurt by being required to pay or make good his guaranty on lease contracts given for them and assigned by him in settlement of his obligation to pay for the same. As to the rest of these 59 machines, Milner is entitled to return them to the plaintiff and receive credit on his account by their price to him. He is also entitled on his counterclaim to a credit as to any commissions he paid for the alleged sales of the machines so allowed by this opinion to be returned by him. Milner does not dispute items a, b, and c of the account as above set out, and as to this judgment should be rendered against him, as well as for the first 20 machines as hereinbefore indicated. As to the other items, they should be adjusted as herein indicated. It is impossible in the present state of the record to arrive at what money judgment should be entered under the principles

herein announced, for which reason this judgment must be reversed for proceedings consistent with this opinion, the parties being entitled to take such additional proof as may be necessary to determine what machines of the 59 additional ones have been sold for cash or under valid lease contracts. It is so ordered.

Whole court sitting.