**E. C. SMALLWOOD, Appellant,**

v.

**CENTRAL KENTUCKY NATURAL GAS COMPANY, Harry Peet, Jr., and Kentucky Creosoting Company, Appellees.**

**E. C. SMALLWOOD, Appellant,**

v.

**CENTRAL KENTUCKY NATURAL GAS COMPANY, Appellee.**

Court of Appeals of Kentucky.

Oct. 18, 1957.

Rehearing Denied Jan. 24, 1958.

Redwine & Redwine, Winchester, for appellant.

Lewis A. White, Mt. Sterling, for appellee Central Kentucky Natural Gas Co.

Strange & Pendleton, Stanton, for appellee, Harry Peet, Jr.

STEWART, Judge.

This appeal is from a judgment of the Powell Circuit Court entered in the consolidated actions of E. C. Smallwood, plaintiff, v. Central Kentucky Natural Gas Company, Harry Peet, Jr., and Kentucky Creosoting Company, defendants, and of Central Kentucky Natural Gas Company, plaintiff, v. E. C. Smallwood and Forrest Kinser, defendants. In the first suit Smallwood, as plaintiff, sought damages in the sum of $10,-000 for gas taken from under a certain piece of property and, in addition, an injunction to restrain defendants from removing any

other gas from under this parcel of land. While this suit was pending, Smallwood, through an employee, one Forrest Kinser, started to drill for gas on this property, and the Gas Company, as plaintiff, filed an action to enjoin them from pursuing this activity.

Here is the background of this litigation. On June 19, 1935, one Pruitt Gibson and one John Smallwood, the father of the Smallwood who is a party to this litigation, executed to Kentucky Edison Company an oil and gas lease covering 90 acres of land lying on Cane Creek in Powell County. This lease in the usual language authorized this company to drill for oil and gas and further provided that the lease was to last for a term of five years "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The consideration for the gas operations under the lease was that the lessors were entitled to an annual sum of $100 for a gas well then on the premises and an additional $50 per year each for any other producing gas wells later brought in. The lease required one additional well to be drilled, and this was done. It is undisputed that payments due the lessors under the lease amount to $150 per year. Kentucky Edison Company, by a recorded assignment dated June 24, 1947, transferred the Gibson and Smallwood lease to the Creosoting Company. On December 15, 1950, the latter assigned the lease to the Gas Company.

John Smallwood died intestate and a widower in 1937, survived by seven children. At the time of his decease he owned the entire surface and one half the mineral rights in the 90 acres covered by the above mentioned lease. This resulted in each inheriting a ¼4th (⅟7th of their father's ½ part) of the total interest in the minerals, subject of course to the lease involved herein. From 1942 to 1950 the respective lessees annually paid E. C. Smallwood ¼4th of the yearly rent of $150, or the sum of $10.71. The Gas Company concedes that it owes Smallwood his proportional amount for each of the years following 1950. In 1951, however, Smallwood refused to accept the rental check for his ¼4th interest, claiming he was owed more. The Gas Company subsequently tendered the rental sums but Smallwood remained steadfast in his refusal to receive payments. In 1952 Smallwood, as already recounted, filed suit and, in brief, contended in his complaint that instead of being entitled only to the rentals set forth he was due part of the proceeds from the sale of the gas. Also, he alleged he had a ⅟7th interest in the property instead of a ¼4th.

On motion of the Gas Company the damage action filed by Smallwood was consolidated with the injunction suit instituted by the Gas Company, and proof taken by depositions in the injunction suit was also considered as evidence in the damage suit. Upon submission, the lower court dismissed Smallwood's suit for damages, permanently enjoined Smallwood and his employee, Kinser, from drilling for oil or gas on the 90-acre tract, and adjudged that Smallwood owns an undivided ¼4th interest in the minerals underlying this tract. He appeals.

Two main questions are posed in this appeal. (1) Is the Gibson and Smallwood lease in full force and effect or has it been forfeited or abandoned through nonuse? (2) What interest does Smallwood own in the minerals underlying the 90-acre lease? Other points are raised which we shall resolve at the proper time and place.

Appellant, Smallwood, maintains the leasehold has become inoperative because *native* gas or gas in place has not been *produced* from under the 90-acre tract for several years. The Gas Company, appellee herein, admits it has used the two wells on the demised premises almost exclusively for storage purposes for a period of time that is unspecified in the record. It states that when the gas in the wells began to dwindle in quantity it then commenced the practice of piping into them gas brought from distant sources in order to keep a supply on hand for local consumption, and it contends

that it cannot be asserted gas is still not being extracted from each well within the purview of the lease agreement.

■ The argument of this appellee is that the law of this jurisdiction makes no distinction between native gas and gas released for underground storage. It points out in this connection that gas that has once been captured and then set free by being forced into underground pockets by pressure has been held to be analogous to animals "ferae naturae" which have been caught at one place and liberated in another. Gas likewise has fugacious characteristics and, when released to its "wild state", the one-time possessor of it loses all title in and to it the moment it is freed. Under this analogy it is claimed gas once taken and afterwards let loose for subterranean storage is no different, legally speaking, from native gas in place before its initial appropriation. Based upon such a theory appellee reasons that the two wells have continued to produce gas without interruption within the meaning of the lease agreement, even though all gas which was piped out has been gas injected into the exhausted wells from distant points during the past several years. The cases of Central Kentucky Natural Gas Co. v. Smallwood, Ky., 252 S.W.2d 866, and Hammonds v. Central Kentucky Natural Gas Co., 255 Ky. 685, 75 S.W.2d 204, are relied upon to sustain the position that there has been no deviation from the terms of the lease contract.

It is true we held in Central Kentucky Natural Gas Co. v. Smallwood, supra, that native gas before reduced to possession cannot be differentiated from gas recovered and then released for underground storage and that the mineral rather than the surface owner was entitled to the royalty accruing under a gas storage lease agreement. The language of that leasehold provided for "storing gas of any kind regardless of the source thereof, including the right of injecting gas in the oil and gas strata and removing the same therefrom." No such broad right as that just expressed was re-

served in the lease contract in the case at bar. In the case of Hammonds v. Central Kentucky Natural Gas Co., cited above, there was involved the question of the ownership of the gas after its extraction and storage in a distant underground reservoir. Obviously, neither of these cases decided the precise issue that confronts us.

At this point, we deem it necessary to quote what we believe is the portion of the contract between the parties that will control our decision of this case. That portion reads: "It is agreed that this lease shall remain in force for a term of five years from date, and *as long thereafter* as oil and gas, or either of them, *is produced from said land by the lessee."* The Gas Company seeks to extend the foregoing language of the lease to include gas brought in and stored in the wells on the basis of the meaning to be attached to the word "gas". Smallwood emphasizes that the phrase "produced from said land" confines the taking to gas recovered only from under the demised land and does not embrace gas injected into the exhausted wells from another source.

In the evolution of oil and gas leases it seems to have dawned upon both lessors and lessees that a lease of land for oil and gas purposes should be limited *to the productive life of the leased premises.* This idea appears to have been first used by inserting in the definite term lease a provision that the *lease should continue thereafter as long as oil or gas were produced from the demised land in paying quantities.* Such leases, as shown by the decided cases, made their appearance in the early '80's, but not, of course, to the exclusion of the definite term lease. This provision, commonly spoken of as the "thereafter" or "paying quantities" proviso, was destined to become the dominant principle of the modern lease contract. See Summers on Oil and Gas, Volume 2, Section 287, page 109.

It is apparent that the main purpose of the "thereafter" clause of an oil and gas lease is to prescribe conditions of fact which must exist within or at the end of the ex-

ploratory period of the lease upon which the lease may be continued beyond the definite term. Since the lessee is the active agency through which these conditions of fact must be caused to exist, it must be determined from the "thereafter" clause what acts are required of the lessee within the exploratory period to effect the uninterrupted course of the lease beyond that period, as well as what acts are required of him, in the event it is so continued, to keep it alive thereafter. See Summers on Oil and Gas, Volume 2, Section 293, page 126.

In the instant case, the "thereafter" clause does not expressly provide any acts to be done by the lessee within the definite term of five years to extend the lease beyond that term, although it does provide for the doing of something after the definite term to keep the lease alive. That required "something" is to "produce" oil or gas "from said land". The term "produced", as used in the lease, in its connection with the whole purpose of the "thereafter" clause and in fact with the entire lease itself, does not mean "stored" in its plain meaning. If the condition of fact necessary for the continuance of the life of the lease beyond the definite term is *production,* it seems that the only logical deduction as to the act required of the lessee for the extension of the lease beyond the definite term of five years is that it be engaged in production, not storage and pumping out, of oil or gas from the land, in some quantity, before and at the end of the definite term. If it is not so acting at that time, the lease ends by its own terms.

The foregoing discussion has led us to the ultimate result that to extend a lease such as the one under examination beyond the fixed term by production, oil or gas must be produced from the demised land. See Summers on Oil and Gas, Volume 2, Section 295, page 131. The lease in the instant case expressly provides that oil or gas be "produced from said land by the lessee." It cannot be said that storage of gas brought in from other areas which has been injected into the reservoir beneath the land and then later pumped out was in the minds of the parties when the lease was executed. The lease has been terminated by its own terms.

This brings us to the second principal question: What is the extent of appellant's interest? It will be recalled he claims a ⅐th interest in the property instead of a ¼₄th which the lower court adjudicated him to have. The controversy arose in this fashion. After the death of John Smallwood, three of his seven children, Julia Combs, Kent Smallwood and Clarence Smallwood, together with their spouses, conveyed their interest in the 90-acre tract to Alec Daugherty and his wife, Rena, the latter being another one of the Smallwood children. The Daughertys then conveyed their interests to Kent Smallwood and appellant. Thereafter Kent Smallwood, appellant, and J. W. Smallwood, another child, of John Smallwood with their wives, executed a deed to appellee, Harry Peet, Jr. Then appellant bought the share of his sister, Gertrude Amburgey, in the land. This, the Amburgey interest, is the only portion of the tract the Gas Company admits appellant owns. However, appellant maintains that in the deed he, Kent Smallwood and J. W. Smallwood executed to Harry Peet, Jr., he did not convey the interest he obtained from his father by inheritance but only the interest he acquired by the aforementioned deed from the Daughertys.

The difficulty in interpreting the just mentioned deed lies in the fact that the granting clause of it seemingly conveys *all* of the grantors' title in the property, although the word "all" does not specifically appear in the instrument, and, aside from this, the reference to the source of title merely states that the property conveyed is the same as that deeded to the grantors by the Daughertys. Appellant maintains this second factor indicates he intended to convey only the interest he acquired from the Daughertys and not that

interest plus the interest he inherited from his father.

■ We are unable to sustain appellant's contention. It is elementary that ambiguities in a deed are generally construed in favor of the grantee. 16 Am.Jur., Deeds, Sec. 165, p. 530; 26 C.J.S.. Deeds § 100f, p. 873; Campbell v. Wells, 278 Ky. 209, 128 S.W.2d 592. The deed should usually be regarded as conveying the largest interest which the grantor could convey. Honaker v. Hutchinson, 305 Ky. 790, 205 S.W.2d 683. Our conclusion in this respect is strengthened by the fact that the other grantors under this instrument evidently believed they were conveying their inherited rights as well as their rights under the Daugherty deed, because they have made no demand for rentals since they consummated this transfer of their respective titles.

■ Appellant's behavior after the execution of the deed to Harry Peet, Jr., likewise bars him from now asserting he owns the 1/14th interest inherited from his father. He at no time prior to the assignment of the lease to the Gas Company claimed any portion of the property except the 1/14th mineral interest acquired from his sister, Gertrude Amburgey. Before 1942, in which year appellant purchased the Gertrude Amburgey 1/14th interest, he apparently received no rentals at all. After acquiring the Gertrude Amburgey 1/14th interest, Kentucky Edison Company and later the Creosoting Company paid him annual rentals of $10.71, representing a 1/14th part of the total rental of $150. For eight years appellant accepted rental payments on the basis of ownership of an undivided 1/14th interest in the minerals. Such conduct demonstrates conclusively to our minds that he intended to, and did, convey his inherited interest to Harry Peet, Jr., in 1938.

■ The contention that the lower court was in error in consolidating the two cases involved here is patently without merit. Common questions of law and fact are obviously involved here, and this warranted the court's action in this regard. CR 42.01. In fact, it is difficult to conceive of two cases more suitable for consolidation.

Wherefore, the judgment is reversed insofar as it held the lease was not terminated and affirmed to the extent it decreed appellant owns an undivided 1/14th interest in the minerals.