**TEXAS AMERICAN ENERGY CORPORATION, Movant,**

v.

**CITIZENS FIDELITY BANK & TRUST COMPANY, Respondent.**

Supreme Court of Kentucky.

Sept. 3, 1987.

Flem Gordon, Gordon & Gordon, Owensboro, for movant.

Lively M. Wilson, Calvert T. Roszell, T. Kennedy Helm, III, Stites & Harbison, Louisville, for respondent.

## OPINION OF THE COURT

This court having granted discretionary review from an opinion of the Court of Appeals and being of the opinion that the Amended Opinion of the Hopkins Circuit Court by Honorable Thomas B. Spain, judge of said court, is correct, hereby adopts that opinion as the opinion of this court, as follows:

"This is a proceeding on a Joint Petition for a declaration of rights, pursuant to K.R.S. 418.020. [Movant], Texas American Energy Corporation (Texas American), is the successor by purchase to the assets and property of Western Kentucky Gas Company (Western), the principal business of which is the purchase of natural gas for resale to consumers.

"Effective June 29, 1983, Texas American entered into a $24,000,000 Revolving Loan Agreement with Respondent, Citizens Fidelity Bank & Trust Company, of Louisville, Kentucky, and Interfirst Bank Dallas, N.A.; The Northern Trust Company and Bank of the Southwest National Association, Houston (the Banks) to provide funds to Western for the periodic purchase of natural gas from its supplier. Such purchased gas is extracted from natural gas fields in Texas and Louisiana and piped to Western's pipeline distribution system in Kentucky. Western then stores surplus gas in its underground storage fields during the off-season and retrieves it during the peak demand mid-winter months for distribution to its customers.

"To secure the above-mentioned loan, Texas American, Citizens Fidelity and the Banks all agreed for a security interest to be conveyed in Texas American's gas in storage as discussed above. A dispute has arisen, however, as to whether such injected stored gas is personal property, susceptible of encumbrance merely by a security

interest agreement as provided for in Article 9 of the Uniform Commercial Code (K.R.S. 355.9–102(1)(a)) as insisted by Texas American or whether such stored gas upon injection, once again becomes in the eyes of the law, an interest in real estate, the encumbrance of which could be accomplished only by a real estate mortgage, as argued by Citizens Fidelity and the Banks.

"Western has six storage fields, four of which are in Daviess County, Kentucky, and two of which are in Hopkins County, to wit: The St. Charles Storage Field and the Kirkwood Springs Storage Field. These storage fields are comprised of underground acreage leased from mineral owners containing various types of sandstone formations capable of accepting and containing natural gas because of being surrounded by strata that are impervious to the migratory characteristics of natural gas. These formations once contained indigenous or 'native' gas, but it has been long ago produced to depletion.

"It is not disputed that once foreign gas (sometimes called 'extraneous gas') is injected into these storage reservoirs, it is trapped, cannot escape, and remains exclusively within Western's control, because of Western's method of maintaining the integrity and viability of its storage fields through constant maintenance of 'cushion gas' therein. Furthermore, the Kentucky Department of Mines and Minerals has recently promulgated regulations requiring a 2,000 foot buffer zone around a gas storage field. Western has obtained permits for such buffer zones around its field, thus assuring their continued protection and integrity.

"With these facts in mind, we now move to the first question to be answered, namely whether natural gas, removed from its original 'home' and injected into a foreign location with confinement integrity, remains personal property as it is uniformly held to be upon its original production, or whether it reverts to an interest in real estate.

"The parties agree that until now the case law in Kentucky has considered such injected or extraneous gas not to be personal property when it is not confined. This is because of an opinion of the late revered Commissioner Osso Stanley of the former Court of Appeals in the now fifty-year-old case of *Hammonds v. Central Kentucky Natural Gas Co.*, Ky., 255 Ky. 685, 75 S.W.2d 204 (1934).

"In that case Della Hammonds owned 54 unleased acres located within the boundary of the gas company's 15,000 acre gas storage field. It was undisputed that the reservoir underlay her tract. She sued alleging trespass because the gas company's injected gas had 'invaded' the formation under her land without her consent. The trial Court found against her but Kentucky's highest Court reversed, holding that once the foreign gas was injected back into the earth, (into an uncontrolled gas storage formation), it ceased being the property of the gas company, and would only become personal property again when and if it was produced or reduced to actual possession by extraction a second time.

"In reaching this conclusion, Commissioner Stanley traced the evolution of judicial thought with regard to oil and gas as distinguished from the 'solid minerals.' He adopted the then popular theory that because of their fugacious nature, oil and gas were 'wild and migratory in nature,' and hence similar to animals *ferae naturae* (i.e. wild by nature). This being so, he reasoned, the law as applied to wild animals ought to be applicable by analogy to oil and gas—minerals *ferae naturae*. Consequently, since a fox until his capture in the forest belonged to all mankind, and if trapped and released in another forest reverted to common property, shouldn't the same logic apply to 'captured' and injected natural gas? Commissioner Stanley also quoted from Thornton's Work on Oil and Gas, Sect. 1264, wherein Judge Willis equated injected gas in storage with timber. 'Standing in the woods, timber is a part of the land. When severed it becomes personal property. If made into lumber and used to construct a building it becomes again a part of the land to which it is attached. When gas is stored in the natural reservoir it is subject to all the proper-

ties that inhered in it originally. A neighbor could take it with impunity through adjacent wells, if he owned land within the radius of the reservoir. Hence it should be taxed only as part of the land in which it is placed, and in such circumstances could not be treated as personal property.'

"Texas American calls this Court's attention to the cases of *White v. New York State Natural Gas Corporation*, · 190 F.Supp. 342 (W.D.Pa.1960) and *Lone Star Gas Company v. Murchison*, 353 S.W.2d 870; 94 A.L.R.2d 529 (Tex.1962). In both these cases *Hammonds* is referred to and rejected, along with the 'wild animal' analogy as applied to injected stored gas. The following portion of the opinion in *White* is particularly succinct:

'Generally stated, the law relating to ownership of wild animals is based on possessory concepts, with title being acquired only by reduction of the animal *ferae naturae* to possession and being divested by loss of possession through escape and return of the animal to its natural and ferocious state. 2 Am.Jur., Animals § 8–13.

It becomes readily apparent, however, that a strict application of this analogy to the present facts is of no benefit to the plaintiff's cause. To begin with, the storage gas in question has not escaped from its owners. On the contrary, it is yet very much in the possession of the storage companies, being within a well-defined storage field, the Hebron-Ellisburg Field, and being subject to the control of the storage companies through the same wells by which the gas originally had been injected into the storage pool. Citing cases.

Moreover, there has been no return of storage gas to its 'natural habitat' since Southwest gas, differing materially in chemical and physical properties from native Oriskany gas, is not native to the Oriskany Sands underlying the Hebron-Ellisburg Field. Deferring to the analogy of animals *ferae naturae* under the circumstances of this case would no more divest a storage company of title to stored gas than a zookeeper in Pitts-

burgh to title to an escaped elephant. 2 Am.Jur., Animals § 13.

"In *Lone Star* the Court comments that our *Hammonds* case 'in its application of *ferae naturae* doctrine, has been the subject of violent adverse criticism by many authors and law review writers' (Citing Summers, 'Oil and Gas' permanent Ed. Vol. 1, p 173; 21 U. Kan. City L. Rev. 217, 220 (1954), 35 Va.L.Rev. 947 (1950), 16 Tex.L. Rev. 370, and numerous others.) The Opinion then continues:

'From the available authorities on this subject and based upon what we consider to be sound and logical reason, especially in the light of advanced knowledge and scientific achievement in the oil and gas industry, we are of the opinion that the rule of the Hammonds case should not be embraced as the law in Texas. An exegesis of the Hammonds opinion, when considered in the light of present day development of the gas industry, is unimpressive. The analogy of wild animals upon which Hammonds is founded fails to undergird the ultimate decision of that case. Gas has no similarity to wild animals. Gas is an inanimate, diminishing non-reproductive substance lacking any will of its own, and instead of running wild and roaming at large as animals do, is subject to be moved solely by pressure or mechanical means. It cannot be logically regarded as personal property of the human race as are wild animals, instead of being turned loose in the woods as the fanciful fox or placed in the streams as the fictitious fish, gas, a privately owned commodity, has been stored for use, as required by the consuming public being, as alleged by appellant, subject to its control and withdrawal at any time. Logic and reason dictates the application of the White decision rather than Hammonds, to the end, that in Texas, the owner of gas does not lose title thereof by storing the same in a well-defined underground reservoir.'

"For the same 'sound and logical reason, especially in the light of advanced knowledge and scientific achievement in the oil and gas industry ...' this Court is of the opinion that it is time to limit *Hammonds*

and to now hold that natural gas once converted to personal property by extraction remains personal property notwithstanding its subsequent storage in underground reservoirs with confinement integrity.

"Hammonds should be narrowly construed or limited as it applies to the instant case, for the reason that the fact situations in the two are distinguishable. In *Hammonds* there was a known 'leak' in the gas storage reservoir inasmuch as Mrs. Hammonds' land was, in fact, a part of the natural reservoir, though not controlled by the storage company. In the case at hand, however, it has been stipulated that the gas reservoir has total integrity, and the gas cannot escape nor can it be extracted by anyone except Western. Using the *ferae naturae* analogy, Western has captured the wild fox, hence reducing it to personal property. The fox has not been released in another forest, permitting it to revert to the common property of mankind; but rather, the fox has only been released in a private confinement zoo. The fox is no less under the control of Western than if it were on a leash.

"Accordingly, the Court is of the opinion that *Hammonds* does not control in the instant case and that under the stipulated facts, the injected gas remains the personal property of Western.

"This being so, there is no more reason to require that it can only be hypothecated or encumbered by a real estate mortgage than there would be to require such of a recreational vehicle temporarily parked at a campground or of coal stockpiled at a tipple."

End of opinion of lower court.

It is therefore the opinion of this court that, in those instances when previously extracted oil or gas is subsequently stored in underground reservoirs capable of being defined with certainty and the integrity of said reservoirs is capable of being maintained, title to such oil or gas is not lost and said minerals do not become subject to the rights of the owners of the surface above the storage fields. Such previously extracted oil or gas, thus stored, is "goods"

under the Uniform Commercial Code of Kentucky and the proper manner of encumbering an inventory of said minerals in storage is controlled thereby. Any language indicating the contrary in *Hammonds v. Central Kentucky Natural Gas Co.*, 256 Ky. 685, 75 S.W.2d 204 (1934); *Central Kentucky Natural Gas Co. v. Smallwood*, Ky., 252 S.W.2d 866 (1952); and *Smallwood v. Central Kentucky Natural Gas Co.*, Ky., 308 S.W.2d 439 (1958), is specifically overruled.

STEPHENS, C.J., and GANT, LAMBERT, LEIBSON, VANCE and WINTERSHEIMER, JJ., concur.

STEPHENSON, J., dissents and files a separate dissenting opinion.

STEPHENSON, Justice, dissenting.

The majority opinion ignores the most significant aspect of this entire proceeding; that is, an abuse of the Declaratory Judgment Act, KRS 418.020. This act requires that a real controversy exist. There is none here. The issue here is a theoretical argument about the nature of the natural gas stored in Texas American's reservoirs. Texas American requested and received an opinion that the gas is personal property and thus subject to a security interest. Citizens Fidelity argues the natural gas is real property although it may consider it anyway it wishes for the purpose of lending money. The majority view is not binding on Citizens Fidelity in any respect. This court has, therefore, delivered an *advisory* opinion without any reference to a long-standing policy against such opinions.

*Hammonds, Central Kentucky Natural Gas,* and *Smallwood* are so different in factual situations that the only justification for citing them is to emphasize that difference. To reach the result of this advisory opinion which binds neither of the parties, nothing in the three cases is overruled.

Accordingly, I dissent.