**Beverly Cardwell BOWLES and Donna Faye Cardwell, Appellants,**

v.

**HOPKINS COUNTY COAL, LLC; AMCA Coal Leasing, Inc.; Potter Grandchildren's, LLC; and The Heirs, Successors, and Assigns of Kenneth Snarr and Joe Davis, Appellees.**

No. 2009–CA–001209–MR.

Court of Appeals of Kentucky.

June 24, 2011.

tle more than an adoption of the prison mailbox rule by another name." *Id.* at 796 (Roach, J., dissenting).

Kenneth W. Humphries (argued), Hopkinsville, KY, for appellants.

Jeff A. Woods (argued), Justin W. Ross, Lexington, KY, for appellee, AMCA Coal Leasing, Inc.

Bryan R. Reynolds, Owensboro, KY, for amicus curiae, Kentucky Oil and Gas Association, Inc.

David H. Thomason, K.T. Williams (argued), Henderson, KY, for appellee, Hopkins County Coal, LLC.

Julia Hawes Gordon, Flem Gordon, Owensboro, KY, for appellees, Potter Grandchildren's, LLC; Kenneth Snarr; and Joe Davis.

Before DIXON and NICKELL, Judges; SHAKE,[1] Senior Judge.

## OPINION

SHAKE, Senior Judge:

Beverly Cardwell Bowles and Donna Faye Cardwell ("Appellants") appeal from the February 13, 2009, opinion and judgment, and May 29, 2009, order of the Hopkins Circuit Court. Those judgments relate to certain real property and addressed the validity of a restrictive covenant forbidding surface mining of the property; the use of a water impoundment to reclaim a surface-mined portion of the property; and ownership rights of the coal bed methane ("CBM") located within the property. Because we find no error with the trial court's judgments, we affirm.

In 1924, Eva Cardwell conveyed all of the veins and beds of coal and underlying fire clay located in a particular 1060.99–acre tract of land in Hopkins County, Kentucky, to W.B. Dozier ("Dozier"). Eva Cardwell reserved ownership of all other minerals and mineral rights, as well as the surface of the property. The conveyance contained a restrictive covenant which prohibited coal mining of the property by either the stripping or open-pit method. The conveyance also required that, should any surface of the land be taken for any mining purposes whatsoever, then the party taking the surface must reimburse the owner of the surface a reasonable price.

In 1960, and after Eva Cardwell's death, her son, Robert Stroud Cardwell, along with his wife, Anna Louise Cardwell, conveyed the surface interest in 997.52 acres of the property to Albert Marion Bable and James Woodrow Offutt. That conveyance excluded all of the coals and coal mining rights and other rights which had previously been conveyed to Dozier in 1924. It also reserved conveyance of all other minerals and mineral rights in and under the property.

Appellants, Eva Cardwell's grandchildren, are successors-in-interest to the surface and other mineral rights of 61.47 acres, along with the other minerals and mineral rights in and under the other

---

1. Senior Judge Ann O'Malley Shake sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

997.52 [2] acres. Hopkins County Coal Company, LLC ("HCC") is Dozier's successor-in-interest with respect to the number 13 and number 14 coal seams. The heirs and descendants of Kenneth Snarr and Joe Davis, and Potter Grandchildren's, LLC ("Potter") are the successors-in-interest to all of Dozier's rights below the number 13 coal seam.

In 2005, Appellants discovered that the surface of the property was being stripmined by HCC. They filed a complaint with the U.S. Office of Surface Mining Reclamation and Enforcement ("OSM") asserting that HCC had unlawfully mined the property in direct violation of the restrictive covenant. Appellants were advised by OSM that HCC obtained the right to surface mine the property when HCC or its predecessor, Andalex Resources, acquired the title to both the coal and the surface, effectively terminating the restrictive covenant.

Appellants then filed a complaint with Hopkins County Circuit Court. They sought declaration from the court that the surface mining was in violation of the restrictive covenant; an order enjoining further violation of the restrictive covenant; attorney's fees and costs; and other relief to which they were entitled. Appellants also filed an amended complaint in which they alleged that the intended reclamation of the property surface, permanent impoundment(s) of water as lake(s), violated the Appellants' rights to the use and enjoyment of mineral rights located below the property. Appellants also sought a declaration of rights from the trial court which would prohibit the creation of the permanent impoundment lake(s) on the property surface.

On March 30, 2007, the trial court issued a declaratory judgment. The trial court found that the restrictive covenant was extinguished, by means of merger, upon HCC's combined ownership of the property surface and the number 13 and number 14 coal seams. The judgment also found Appellants to be the proper owners of all the CBM by virtue of their ownership of all other minerals. Thereafter, the trial court granted a motion by HCC and Potter to vacate that portion of the judgment relating to the ownership of the CBM, and the parties were given the opportunity to provide additional briefing on that issue.

Following the additional briefing, an opinion and judgment was entered on February 13, 2009. The trial court found that although the CBM was subject to capture by the Appellants once it had escaped the coal or vein of coal, it was owned by the owner of the coal while it was still located within the coal seam or vein. It also found that the impoundment of 36 acres, over a total of 1060.99 acres, was not an unreasonable burden to be imposed by the surface estate, HCC, on the mineral estate, the Appellants.

Appellants filed a motion to alter, amend, or vacate the February 13, 2009, order and judgment. As a result, the trial court issued an order on May 29, 2009, and found that Appellants are entitled to produce any CBM located in the voids created during mining operations. The court further instructed that Appellants could only attempt to remove the CBM after confirming that all coal mining operations had

---

**2.** This Court recognizes that the two pieces of property, at 997.52 acres and 61.47 acres, fall 2 acres short of the original property of 1060.99 acres. Some inconsistencies of the property size can be found in Appellants' complaint and amended complaint, so it is unclear what the exact sizes of the properties are. However, as this issue is not in dispute, we will accept the property sizes represented in the trial court's order: 997.52 acres and 61.47 acres.

been completed. The trial court based this instruction on its finding that to do otherwise would pose a safety risk to the coal miners. All other portions of Appellants' motion to alter, amend, or vacate were denied. This appeal followed.

█ On appeal, Appellants first address the restrictive covenant. Appellants argue that the intent of the parties should govern the ultimate application of the restrictive covenant. Specifically, they argue that the original intent of the parties was to preserve the property surface and prevent its ever being strip-mined. In its March 30, 2007, declaratory judgment, the trial court found that because the Appellants possess no ownership interest in either the coal or surface estate, that they have no standing to assert the validity of the restrictive covenant. Our review of the trial court's analysis goes unchallenged.[3] Once the surface of the property was conveyed to the owners of the coal estate, the surface protection created by the restrictive covenant ceased to exist. At oral argument, Appellants argue, for the first time, that the intent behind the creation of the restrictive covenant was to protect the mineral estate by preserving the property surface. Although this is an interesting argument, Appellants failed to offer any evidence of the suggested intent, and also failed to show that such an argument was presented to the trial court. Furthermore, the argument was not presented in Appellant's brief. Instead, Appellants conceded in their brief that the issue is now moot. Consequently, Appellants' argument is rejected.

Appellants next address the future reclamation of the mined property. Currently, HCC is seeking approval of a mining revision from the Kentucky Department of Natural Resources, to fill the mined pit with water and create an impoundment. Appellants wish to have the property refilled with dirt. The trial court found that a 36–acre impoundment on a 1060.99–acre tract was not a significant interference with Appellants' legitimate and reasonable activities and operations as owners of the minerals in the property. Appellants concede that they failed to request a hearing on the matter and further concede that the record contains no evidence which would allow this Court to reverse the trial court's ruling. As such, that portion of the trial court's order remains undisturbed and is affirmed.

█ The final issue which Appellants address is the ownership of the CBM. In order to provide a better understanding of the issue before us, we think it helpful to provide a brief explanation of CBM and its purpose. We adopt the concise explanation found in the trial court's February 13, 2009, opinion and judgment, which provides:

[c]oal exists in subsurface strata referred to commonly as seam, veins or beds of coal. CBM is a methane gas contained or trapped within the coal strata. It has always been present in the coal, but only in recent years has it become profitable to produce. Previously, it was considered a dangerous by-product of the coal, [4] and had to be ventilated from coal mines for the safety of miners. This process of ventilation of

---

3. Appellants' lack of standing is only applicable to those 997.52 acres of which they possess neither the coal nor surface rights. It has no bearing on their current ability to enforce the restrictive covenant on the 61.47 acres of which they possess ownership of the surface.

4. Appellants challenge the trial court's classification of CBM as a by-product of coal. However, because this distinction has no bearing on the issue at hand, it will not be addressed.

CBM continues to be an important task in mining operation to preserve the safety of the underground coal miners. The only previous interest in CBM was how to best eliminate it from the coal and get rid of it by ventilating into the atmosphere or even burning it off. There were, of course, no arguments at that time regarding ownership. The arguments started when it became potentially profitable to produce.

The trial court then adopted the description of coal composition and CBM gas as described by The United States Supreme Court. That description, which we also adopt herein, is as follows:

a heterogeneous, noncrystalline sedimentary rock composed primarily of carbonaceous materials. It is formed over millions of years from decaying plant material that settles on the bottom of swamps and is converted by microbiological processes into peat. Over time, the resulting peat beds are buried by sedimentary deposits. As the beds sink deeper and deeper into the earth's crust, the peat is transformed by chemical reactions which increase the carbon content of the fossilized plant material. The process in which peat transforms into coal is referred to as coalification.

The coalification process generates methane and other gases. Because coal is porous, some of that gas is retained in the coal. CBM gas exists in the coal in three basic states: as free gas; as gas dissolved in the water in coal; and as gas "adsor[b]ed" on the solid surface of the coal, that is, held to the surface by weak forces called van der Waals forces. These are the same three states or conditions in which gas is stored in other rock formations. Because of the large surface area of coal pores, however, a much higher proportion of the gas is adsor[b]ed on the surface of coal than is adsor[b]ed in other rock. When pressure on the coalbed is decreased, the gas

in the coal formation escapes. As a result, CBM gas is released from coal as the coal is mined and brought to the surface.

*Amoco Prod. Co. v. S. Ute Indian Tribe,* 526 U.S. 865, 872–873, 119 S.Ct. 1719, 1724, 144 L.Ed.2d 22 (1999) (internal citations omitted).

The trial court provided additional instructive language in its May 29, 2009, order, as follows:

[i]n traditional mining operations coal is removed by the "room and pillar" method. This results in the removal of "rooms" of coal and leaving "pillars" of coal to support the surface. After the mining process is completed and all the coal is removed, coal bed methane will migrate to these "rooms" or "voids."

The trial court, citing to the Illinois case of *Continental Resources of Illinois, Inc. v. Illinois Methane, LLC.,* applied the rule of capture to the CBM. That case states, in relevant part:

Oil and gas in place are minerals, but because of their fugacious qualities, they are incapable of ownership distinct from the soil. They belong to the owner of the land only so long as they remain under the land, and if the owner makes a grant of them to another, it is a grant only of the gas and oil that the grantee takes from the land. Oil and gas are incapable of ownership until actually found and produced. This principle is the basis for the rule of capture. Under the rule of capture, gas that migrates from one property to another is subject to recovery and possession by the holder of the gas estate on the property to which the gas migrates. Because coalbed gas is similar to and migrates in the same manner as other natural gas, there is no reason that the rule of capture and the laws governing the ownership of migratory natural gas should not apply to coalbed methane gas as well.

*Continental Resources of Illinois, Inc. v. Illinois Methane, LLC*, 364 Ill.App.3d 691, 694–95, 301 Ill.Dec. 887, 847 N.E.2d 897, 901 (Ill.App.Ct.2006) (citations omitted).

The trial court went on to demonstrate that the analysis of *Continental Resources* has been applied to Kentucky law by *Texas American Energy Corp. v. Citizens Fidelity Bank & Trust Co.*, 736 S.W.2d 25, 28 (Ky.1987). The Kentucky Supreme Court, in *Texas American Energy*, likened the characteristics of oil and gas to the fugacious nature of a wild fox. *Id.* So long as the fox remains uncaptured, it *belongs* to no one, but is subject to capture and ownership by the land owner. *Id.* (emphasis added). However, once the fox has migrated to another piece of property, it is then subject to capture and ownership by the owner of that property. *Id.* The Court therefore concluded that, like the wild fox, oil and gas belong to no one but instead are subject to capture and ownership by the owner of the land upon which they reside at any given time. *Id.* Although the facts in *Texas American Energy* pertain to the ownership of natural gas that has migrated from one property to another, the analogy is equally applicable when there are separate property interests in the same parcel of property.

The trial court found that Appellants are entitled to produce any CBM that has migrated from the coal seam or vein in which it was located, including any CBM which is located in the voids created during the mining operation. However, the trial court clarified that Appellants' right to remove CBM only arose after the mining operations were complete. Appellants do not challenge the finding that CBM is subject to the rule of capture. Instead, Appellants argue that they are entitled to extract CBM while it still exists confined within the coal seam, prior to the mining of the coal.

■ Under the rule of capture, gas is subject to recovery and possession by the owner of the land. *See, e.g., Texas American Energy Corp. v. Citizens Fidelity Bank & Trust Co., supra.* In this case, different parties own different elements of the land. The surface of the property is owned in part by Appellants and in part by Albert Marion Bable and James Woodrow Offutt. The veins and beds of coal and underlying fire clay are owned in part by HCC and in part by the heirs and descendants of Kenneth Snarr and Joe Davis, and Potter. "The other minerals and mineral rights" are owned by Appellants. The issue then becomes: is CBM part of the veins and beds of coal, or is it another mineral separate from what was conveyed with the "veins and beds of coal?" Appellants maintain that because they own the "other minerals" of the property, that they also own the CBM, regardless of whether it is located in the veins and beds of coal or out of them. We do not agree.

The original 1924 conveyance of the coal beds indicated transfer of:

> [a]ll of the veins and beds of coal in and underlying 1060.99 acres of land ... together with the fire clay immediately underlying said veins and beds of coal and the right to mine; dig for, take and remove all of said coal and fire clay and the free uninterrupted right of way underneath the surface of said lands for entries, air courses, and other passages for use in coal mining operations and the right to haul through said underground passages, tools, supplies, appliances, machinery, timbers and other coals and the right to use as much of the surface space for said lands as is necessary for air shafts, bore holes, ditches, and access to and from same which may be necessary for draining and ventilating any mines for taking out said coals and fire clays, but with the provision and upon condition that said coal shall not be mined by stripping or open pit method.....

Under the definition of CBM given by *Amoco,* and adopted by this Court, CBM is actually located *within* the strata of the coal beds. Therefore, it is available to be captured only by the owners of the coal beds. At the time that the CBM is released from the coal beds, it is then available to be captured by the owner of whatever property to which it migrates, in this case perhaps that of the Appellants. At the time the coal beds were conveyed, CBM was not actively being pursued as a profitable product but was instead considered a valueless, dangerous waste product. In other words, it was not anticipated by either party that CBM would be actively pursued by the party retaining the rights to all other minerals. Therefore, if we were to hold that Appellants had ownership rights of the CBM while it was still within the coal beds, then the original conveyance would be worth less than the consideration given for it, making the retention of the now valuable CBM an unbargained for exchange. We do not believe it was the intent of Eva Cardwell to retain any ownership interest in a valueless waste product. Her grantee undertook responsibility for the safe disposal of CBM, which would have to be ventilated from the earth in order for mining operations to proceed. Therefore, we hold that the trial court was correct in finding that the owner of the coal beds has the right to capture CBM while still located therein and Appellants have the right to capture once the mining process is complete. Although the circumstances of the case *sub judice* grant the coal bed owners the right to capture CBM while it is still located in the veins and beds of coal, our holding is not dispositive of the issue of CBM ownership[5] as a whole. We recognize that the same issue under changed circumstances may result in a dissimilar outcome.

Appellants further argue that the trial court's finding, that the removal of CBM prior to the mining of the coal creates a danger to the underground miners, is unsupported by the record. Appellants ask this Court to reverse the trial court's judgment so that they may be given the opportunity to provide evidence that the CBM can be extracted directly from the coal seams without increasing the risk to underground miners or making the process of mining more dangerous. However, this argument is only relevant if we were to hold that Appellants had the right to capture CBM while it is still located within the coal beds. Since we have already held that, in this case, the owner of the veins and beds of coal possesses the right to capture any CBM within those veins and beds, Appellants' argument regarding its safe capture in that location is moot.

For the foregoing reasons, the February 13, 2009, opinion and judgment, and May 29, 2009, order of the Hopkins Circuit Court are affirmed.

ALL CONCUR.

---

**5.** Although the trial court's February 13, 2009, order identifies the owners of the coal estate as the "owners" of the CBM within the coal seam or vein, the remainder of the trial court's order is clear that the rule of capture applies. The order clarifies that the owners of the coal estate may produce the CBM while it is present in the coal seam or vein, but that it is subject to capture by the owner of the mineral estate in the event that it should migrate from the coal seam or vein. Therefore, the trial court's use of the word "owner" does not encompass the traditional definition of the word, but rather translates to mean the party with the right to capture. Likewise, this opinion should not be translated as addressing the "ownership" of the CBM, but rather which party possesses the right to capture.