## NADEL et al. v. ZELIGSON.

No. 34425. July 29, 1952.

Rehearing Denied Nov. 18, 1952.

Application for Leave to File Second
Petition for Rehearing Denied
Jan. 20, 1953.

*252 P. 2d 140.*

Milsten, Milsten, Johnston & More-
head, Tulsa, McCoy, Craig & Pearson,
Pawhuska, and Hurst & Hurst, Tulsa,
for plaintiffs in error.

Spillers & Spillers, Tulsa, and Till-
man & Tillman, Pawhuska, for defend-
ant in error.

CORN, J. On July 3, 1948, Morris
Zeligson, as plaintiff, commenced this
action in the district court of Osage
county against I. Nadel and H. Guss-
man, copartners doing business as
Nadel & Gussman, and I. Nadel and
H. Gussman, individually. In this ac-
tion Zeligson sought a decree declar-
ing him the owner of an undivided one-
half interest in two oil and gas leases
held in the name of the defendants
upon the theory of a constructive trust
arising from a joint adventure. After
a lengthy trial the court rendered judg-
ment in favor of Zeligson and against
the defendants.

On appeal the assignments of error
asserted by the defendants may be
summarized as follows: First, that the
judgment of the trial court is against
the great weight of the evidence; sec-
ond, that the alleged joint adventure
agreement was without consideration;
third, that it was too uncertain and
indefinite to justfy specific perform-
ance; and, fourth, that Zeligson was
guilty of laches.

The oil and gas leases in question
were the NE/4 and the NW/4 of section
30, township 25 north, range 9 east, in
Osage county, Oklahoma. They will
hereinafter be referred to as the NE/4
and NW/4. In 1934 Zeligson was in-
terested in both leases, and a produc-
ing well was drilled on the NE/4. The
well was then ruined by a nitroglycerin
shot. Thereafter Zeligson dropped the
NW/4 and sold the NE/4 to Nadel. Ze-
ligson and Nadel had been friends and
had been in oil deals together previ-
ously. Zeligson kept his eye on the
leases, however, intending to try to
do something with them if his finan-
cial condition and the price of oil im-
proved. When this occurred Zeligson
went to the office of Nadel in January
or February, 1946, discussed the po-
tentialities of the leases with him and
offered to join with him in a drilling
deal. Nadel then informed him that
he had previously sold an undivided
one-half interest in the NE/4 to one
Simon Lebow. The NW/4 was not un-
der lease at that time. It was then
agreed between the parties that the
NW/4 would be purchased for the joint
adventure at the next sale of the Osage
Indian Agency, that Lebow would be
persuaded to come into the drilling deal
on some basis and the two leases op-

erated as a unit; and that the parties would share in the profits and losses equally. Since Zeligson was not on friendly terms with Lebow, Nadel agreed to undertake the negotiations with him, and stated that he would have a geological map prepared.

Thereafter Nadel caused a geological map to be prepared by one Dillard. He took a photostat of this map to the office of Zeligson, and finding him out borrowed a scrap of paper from Zeligson's secretary, Lucy Ann Ragan, and wrote him a note to the effect that he had been unable to make a deal with Lebow but that the parties should go ahead and drill a well, indicating a location on the map in the NW/4. This map bore the date February 27, 1946. Zeligson displayed this map to the witness Zoller, a geologist and manager of an oil company, who declared that the geological prospects were favorable. Zeligson then discussed the joint adventure with both defendants.

Immediately after the commencement of this action Zeligson's deposition was taken. He testified as to the map and note but stated that as far as he could determine he had misplaced them or left them with the defendants. Then the deposition of Nadel was taken, and he declared that he never heard of any map or note; that he had had some such conversation with Zeligson eight or nine years before, but that he had called Lebow in Zeligson's presence and he refused to enter the deal, and that he told Zeligson that the deal was off; that he had had no further business contacts with Zeligson since that date. About a week before the trial, however, Zeligson moved his office and in going over old papers discovered the missing map and note. When the trial began Nadel was suddenly called as the plaintiff's first witness. He identified the map and note and then admitted delivering them to Zeligson. This constituted a severe impeachment of his prior testimony given by deposition.

The lease sale of the Osage Indian Agency occurred in May, 1946. Zelig-

son was unable to attend the sale. The witness Zoller's company intended to bid on leases at the sale so Zeligson contacted him and he agreed to have the NW/4 put up for sale, which he did, and to buy it in for the joint adventure. Meanwhile the defendant Gussman requested that the Agency put the NW/4 up for sale. Zeligson was then informed by Gussman that he intended to attend the sale and would bid it in for the parties. Zeligson informed Zoller of this and instructed him not to bid on the lease if Gussman appeared at the sale. Zoller then permitted Gussman to buy the lease at the sale in accordance with Zeligson's instructions. The lease was taken in the name of the defendants. Its cost was modest. Thereafter Zeligson tendered his share of the expense but was told to wait until the deal had been made with Lebow. Negotiations between the parties and between the defendants and Lebow continued. Lebow testified that he refused to enter the deal in hopes that the parties would drill without him and he would have the benefit of any information resulting therefrom. He also testified that the defendants informed him that Zeligson had an interest, the exact extent of which they did not disclose, but that he knew Zeligson had an interest. In December, 1946, Nadel suddenly sold his half interest in the NE/4 to Lebow, together with various other leases. Nadel informed Zeligson, however, that it would be as easy to make a deal with Lebow if he owned all of the NE/4 as it would if he owned only half, and that the joint adventure would continue. The parties continued to confer as previously.

In the spring of 1947, Zeligson attempted to get the witness Pepis to drill a well for the parties, without success. Gussman desired to get a drilling contract under the market price and Zeligson was willing to pay the market price. Zoller's company had drilled on a lease with the defendants nearby to the leases in question. Zeligson had no interest in that lease. When this drilling was finished in June, 1947, Ze-

ligson suggested to Gussman that Zoller's company had its drilling tools at hand and that they should give Zoller's company the drilling contract. Since it appeared that the deal might be made, Zoller's company left its drilling tools in the Osage the rest of the summer of 1947. Zeligson employed a watchman to guard the tools. At the end of the summer Zoller became impatient and called Zeligson about the matter. Gussman was out of town and Zeligson suggested that Zoller call Gussman the following day, which he did. Zoller asked Gussman when the defendants and Zeligson were going to drill the well, and Gussman replied that the parties were going to drill the well but not until a deal had been made with Lebow. Zoller then removed his drilling tools from the Osage.

On November 5, 1947, the defendants entered into a secret letter agreement with Lebow by the terms of which the defendants received a half interest in the NE/4 and Lebow agreed to contribute $1,500 bottom hole money to a well which the defendants agreed to drill on the NW/4. The next day Gussman informed Zeligson that after repeated attempts he had been unable to make a deal with Lebow and suggested that Zeligson take an undivided one-third interest in the NW/4 and that defendants would contribute $2 a foot if Zeligson would drill the well. Zeligson replied that this proposal would alter the terms of the joint adventure; that he declined, but would be willing to pay his share of the drilling expense of any drilling contractor that the defendants might select.

Believing that the defendants would go ahead if contractor could be obtained who would drill below the market price, Zeligson contacted various drilling contractors in November and December, 1947. He fixed the dates of these calls by reference to his telephone toll tickets and they were confirmed by the witnesses Vance, Beal, Pepis, Shaffer, Spess and Mitchell. On November 12, 1947, he called Vance and was told that Vance had already talked to Gussman and informed him that he would not drill for less than $2.75 a foot. On December 2, 1947, the defendants did enter into a drilling contract with Vance for that price. The defendants concealed their letter agreement with Lebow and the latter contract from Zeligson. On December 8, 1947, Zeligson sent the driller Mitchell to Gussman, who told Gussman that Zeligson had sent him to inquire about drilling a well for the parties. Despite the fact that the defendants had already let the drilling contract to Vance, Gussman permitted Mitchell to quote him a price of $2.50 a foot and then told him that he wanted to get a contract for $2.25 a foot. Mitchell said he would come back later. Gussman later told Zeligson that he wouldn't let a fellow like Mitchell on the lease. About two weeks later Mitchell again talked to Gussman and was informed that the drilling contract had already been let for $2.25 a foot. Mitchell did not thereafter talk to Zeligson.

The defendants commenced drilling operations on the NW/4. The first hole was lost and abandoned, the rig skidded over and a new well begun which was completed as a producer in April, 1948. Zeligson testified that he knew nothing of this until May 1, 1948, when he chanced to note an erroneous and garbled item in the newspaper to the effect that Lebow and certain third person not involved in this controversy were about to drill on the NE/4. That evening Zeligson met Gussman at the country club and mentioned to him that it appeared that Lebow was drilling. Gussman then told Zeligson that the defendants had already drilled a well on the NW/4, but did not tell him of the letter agreement with Lebow. Zeligson was astonished, but since it was a social gathering told him that he would talk to him later. He then consulted his attorneys.

The first well on the NE/4 was completed in May, 1948, and another well was commenced shortly thereafter on the NW/4. On advice of his attorneys,

Zeligson went to the office of Nadel and talked to him on June 21, 1948. He demanded his share of the NW/4 and tendered his share of the expenses. Nadel told him that Gussman was out of town and requested that he wait until Gussman returned and the matter ironed out. Both Zeligson and Nadel testified that Zeligson declared that he could not wait, that the well in the process of drilling might be a producer or a dry hole and that he was making his tender before that fact was determined. In this conversation Nadel hinted that the defendants had made some sort of deal with Lebow. The following day, June 22, 1948, Zeligson was shown the letter agreement by Lebow. The defendants and Lebow admitted that they had not told Zeligson about the letter agreement previously. On the same day Zeligson made a tender in writing to Nadel of his share of all expenses and demanded his interest in both leases. Zeligson then waited for a reply from Nadel until July 2, 1948, and receiving none he called Nadel. Nadel denied Zeligson's interest and this action was commenced on the following day.

The testimony of Zeligson was free from contradictions; his deposition which had been taken immediately after the commencement of this action offered no consolation for impeachment purposes. The testimony of the defendants, on the other hand, at the trial and by deposition, was confused, uncertain, and in many instances inherently contradictory. The defendants denied the joint adventure, but their denials must be measured in light of their numerous admissions against interest, their contradictory statements, and the general unsatisfactory character of their testimony. The trial court heard the evidence and observed the demeanor of the witnesses. The judgment of the court was based upon a general finding, and this presumes a finding in favor of the plaintiff upon every disputed issue of fact. From the record we could not say that the judgment of the trial court was against the clear weight of the evidence; on the contrary, we find that the evidence amply supports the judgment of the trial court. In this connection we have carefully considered the following decisions of this court dealing with constructive trusts and joint adventures: Dike v. Martin, 85 Okla. 103, 204 P. 1106; Turben v. Douglass, 76 Okla. 78, 183 P. 881; Cassidy v. Hornor, 86 Okla. 220, 208 P. 775; Perry v. Morrison, 118 Okla. 212, 274 P. 1004; Ferguson v. Nagle, 159 Okla. 219, 15 P. 2d 1; Kirkpatrick v. Baker, 135 Okla. 142, 276 P. 193; Raper v. Thorn, 202 Okla. 235, 211 P. 2d 1007; and also Kasishke v. Baker, 146 F. 2d 113, from the Court of Appeals for the Tenth Circuit.

In Cassidy v. Hornor, supra, this court quoted with approval from Pomeroy's Equity Jurisprudence, vol. 1, p. 155, as follows:

" 'Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner. Courts of equity, by thus extending the fundamental principle of trust—that is, the principle of a division between the legal estate in one and the equitable estate in another— to cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property.' "

Defendants contend that the alleged joint adventure was without considera-

tion. We have previously disposed of a similar contention in Dike v. Martin, supra, wherein we held:

"A contract of joint adventure is sufficiently supported by a consideration growing out of the mutual promises of the parties."

Defendants assert that Zeligson was guilty of laches. This is an affirmative defense upon which they must bear the burden of proof. Zeligson testified that he knew nothing of the drilling of the first well on the NW/4 until May 1, 1948. He made his tender on June 21, 1948, before the second well had been completed and its potentialities discovered. Both Zeligson and Nadel so testified, and this was confirmed by the driller Vance. Gussman's assertion that this second well was completed as a producer on June 20, 1948, at a time when he was admittedly away on vacation, is entitled to little weight. Zeligson knew that one well had been drilled on the NE/4, but the defendants and Lebow testified that they did not tell Zeligson of their letter agreement before June 22, 1948, although Nadel had hinted of its existence on the previous day. On June 22, 1948, Zeligson made a formal written tender to the defendants and demanded his interest, which the defendants rejected. No laches can be charged against Zeligson until he was aware of all of the facts, and this is especially true where his ignorance of the facts resulted from their concealment by the defendants, who owed him the fiduciary duty of making a full and complete disclosure.

Defendants introduced reports from newspapers and periodicals which disclosed their drilling operations, but Zeligson denied without dispute that he had seen them. Defendants' witnesses Travis and Elson testified that in February, 1948, at a party they discussed the lost well on the NW/4 with Gussman; that Zeligson was present with about fifteen other people but did not participate in the conversation; that they paid no particular attention to Zeligson and could not state whether he heard the conversation or not; and that they hoped that the defendants would win the lawsuit. Zeligson denied hearing the conversation. Vance testified that he told Zeligson in April, 1948, that the defendants were drilling; he also admitted that prior to and during the trial of the case he had refused to discuss the nature of his testimony with counsel for Zeligson. Zeligson admitted that he talked to Vance but stated that it concerned another subject entirely. The defendants offered the testimony of the witness Robbins who said that he believed that he discussed the well with Zeligson in January, 1948, but that he was not certain and that the conversation could have occurred after the completion of the first well in April, 1948. Zeligson testified the conversation took place in May, 1948. Finally, the defendant Gussman recalled that he had discussed the matter with Zeligson early in 1948. Zeligson denied this, and Gussman admitted that in his deposition he swore that he had no conversation about the well with Zeligson prior to their conversation of May 1, 1948.

To permit the defendants to conceal from the plaintiff their drilling operations and their letter agreement with Lebow, and then to successfully rely upon laches would be to destroy the very spirit of the doctrine of laches. In 30 C. J. S., Equity, §127, it is said:

"A delay is excusable where it was induced by the adverse party; he cannot take advantage of a delay which he himself has caused or to which he has contributed, especially where actual hindrance has been caused by his fraud or concealment."

In Kilbourn v. Sunderland, 130 U. S. 505, 32 L. Ed. 1005, the United States Supreme Court held:

"We hold that the complainants moved with sufficient promptness upon discovering the fraud, and that although reposing confidence in their agents, they may have neglected availing themselves of some source of knowledge they might have sought, the defendants cannot be allowed to say that complainants ought to have sus-

pected them, and are chargeable with what they might have found out upon inquiry aroused by such suspicions."

Manifestly, Zeligson cannot be charged with laches in respect to the first well on the NW/4 because it had already been drilled when he discovered that fact. Likewise, he could not be charged with laches in respect to the first well on the NE/4. He knew that it was being drilled but did not discover that the defendants were interested in it until June 22, 1948. The second well on the NW/4 had not been completed when he tendered his share on June 21, 1948. It cannot, therefore, be said that he gambled with the defendants' drilling operations, or that the defendants suffered any injury by Zeligson's delay from May 1, 1948, when he learned of defendants drilling activities, until the date of his tender. In Miller v. Roberts, 140 Okla. 271, 282 P. 1104, we held:

"***Where laches are relied upon as a defense for specific performance, it must appear from the evidence that there was actual fraud on the part of the plaintiff, as well as delay, by which defendant was misled to his injury, or resulting in a condition and circumstance which would make it inequitable to decree specific performance; otherwise, equity adopts the statute of limitations.***"

The rule last announced is not limited to cases of specific performance but is equally applicable to the case at bar.

This is a proceeding in equity. The judgment of the trial court is supported by the great weight of the evidence. The principle of law to be applied to this case was stated by this court in Holmes v. Shirley, 178 Okla. 297, 62 P. 2d 990, as follows:

"The decision of a trial court in an equity action on a question of fact which is not contrary to the clear weight of the evidence will not be disturbed on appeal to this court.***"

We have carefully considered the other assignments of error and find them to be without substantial merit.

Affirmed.

ARNOLD, C.J., and WELCH, DAVISON, and JOHNSON, JJ., concur. HALLEY, V.C.J., and GIBSON, O'NEAL, and BINGAMAN, JJ., dissent.