**James C. ELLIS and Wanda Lou Ellis, his wife, Plaintiffs,**

v.

**ARKANSAS LOUISIANA GAS COMPANY, Defendant.**

Civ. No. 76–211.

United States District Court, E. D. Oklahoma.

March 31, 1978.

**414**

Charles B. Grethen, Purcell, Okl., for plaintiffs.

William D. Curlee, Oklahoma City, Okl., for defendant.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

The principal question in this case has not been decided in Oklahoma and remains undecided in the overwhelming majority of jurisdictions in the United States. The question is: when the oil, gas and other minerals have been severed by conveyance from the fee simple estate in a tract of land, and subsequent to severance natural gas is injected in and under that tract of land as a part of an underground gas storage reservoir, from whom must the injector secure permission to store natural gas?

Plaintiffs, James C. Ellis and Wanda Lou Ellis, his wife, are the surface owners of approximately 78 acres of land in Pontotoc County, Oklahoma. They seek to recover damages and injunctive relief for the unauthorized use by defendant of an underground strata of plaintiffs' land for the storage of natural gas. Plaintiffs also seek damages for the unauthorized use of an injection well located on plaintiffs' land and claim that an easement given by plaintiffs to defendant which grants defendant the right to operate a gas injection well on plaintiffs' land should be rescinded for lack of consideration. Mr. Ellis will sometimes be referred to herein as plaintiff.

The defendant denies any liability to plaintiffs, claims it has the right to inject gas by virtue of certain oil and gas leases, gas storage leases and the gas injection easement granted to defendant by plaintiffs. Defendant further claims that plaintiffs' action is barred by the doctrine of prescription.

The case was tried to the court without a jury. At trial neither side introduced into evidence the instruments which effected the severance of the oil, gas and other minerals from the surface and because the court viewed the record as incomplete without such instruments, the court invited counsel to submit them for the court's consideration and to make them part of the record. By stipulation filed on November 22, 1977, counsel so stipulated.

Plaintiffs acquired the surface of approximately 76 acres of the land in question in 1963, referred to in this action as Tract I; they acquired the surface of approximately 2½ acres of the land in question in 1972, referred to in this action as Tract II (Tr. 5 and 19). The surface of Tract I had been severed from the oil, gas and other minerals in 1939 in a deed from O. W. Skirvin to Eunice Davidson which reserved to Skirvin all of the oil, gas and other minerals (Stipulation filed November 22, 1977). Eunice Davidson conveyed the surface of Tract I to her son, Glen D. Davidson, in December of 1962 or January 1963 (Tr. 117) and shortly thereafter in 1963 Davidson conveyed the surface of Tract I to plaintiffs (Tr. 5 and 120).

The surface of Tract II was severed from the oil, gas and other minerals in a series of deeds commencing in 1921 with a complete severance of all oil, gas and other minerals from the surface being effected on July 16, 1945. Plaintiffs have always been surface owners only; they have never been the owners of the oil, gas and other minerals in and under Tracts I and II (Stipulation filed November 22, 1977).

In 1928 the predecessor in title of defendant secured gas leases from the then owners of Tracts I and II. These leases did grant, lease, let and demise unto the lessee for "the *sole* and *only purpose of mining*

*and operating for gas* and laying pipe lines, building tanks, towers, stations and structures thereon, to *produce, save* and take care of said products" on land embraced in Tracts I and II (Emphasis added). Each of the two leases was for a flat term of 50 years, during which 50 year term the lessee was to have "the sole and exclusive right to *prospect* for and *produce*, use and market gas, including the natural gasoline . . ." (Emphasis added). The leases further provided that the consideration paid at the time of lease execution by the lessee to the lessor relieved the lessee of any "obligation to *develop* said lands for gas or pay any rental or royalty on the production thereof, and that no *implied obligation for development* shall apply to this lease as to offset wells or otherwise, and the amount and extent of *exploration* and *development* of said lands shall be optional with lessee only." (Emphasis added). The leases further provided that "failure to develop said lands or any part thereof shall not be construed as an abandonment of the whole or part of the land." (Defendant's Exhibits 1 and 2).

In 1939 the first mineral severance occurred. The deed effecting the severance of the minerals from the surface in Tract I provided in part as follows:

It is especially understood and agreed by the parties hereto that ALL interest in and to all of the oil, petroleum, gas, coal, asphalt and all other minerals of every kind or character in and under, and that may be *produced* from the above described land, is hereby reserved by party of the first part, together with the *right of ingress and egress at all times for the purpose of mining, drilling and exploring* said lands for said minerals and removing the same therefrom, and with the rights of way, easement and servitudes for pipe lines, telephone and telegraph lines, for tanks, power houses, stations, gasoline plants and fixtures for *producing,* treating and caring for such products, and housing and boarding employees, and all other rights and privileges necessary, incident to, or convenient for the economical operation of the said land for the

*production of said minerals,* . . . (Emphasis added).

Exhibit A to Stipulation filed November 22, 1977.

Three deeds effected the severance of the minerals from the surface of Tract II, the last one being executed in 1945. These three deeds provided in part as follows:

1. WITNESSETH: That said parties of the first part in consideration of the sum of One Dollars, ($1.00) and other valuable consideration, the receipt of which is hereby acknowledged, do by these presents grant, bargain, sell and convey unto the said party of the second part, his heirs and assigns, an undivided one-half interest in and to all oil, gas and all other mineral substances in and under the hereinafter described land and the right to *extract and market the same,* together with *all right of ingress and egress,* at all times, *for the purpose of prospecting* for said oil, gas or minerals, including, the right to occupy and use so much of the surface of said land as may reasonably be necessary to carry on the work of *extracting, mining, piping,* . . . (Emphasis added).

Exhibit B to Stipulation filed November 22, 1977.

2. EXCEPT Grantor does hereby except from this grant and reserves unto himself, his heirs, executors, administrators, and assigns, an undivided one-fourth (¼th) interest in and to all of the oil, gas and other minerals, in and under the surface of all the above described lands . . . together with the free right of ingress and egress thereto, and the right to use and occupy such portion of the land as may be reasonably necessary for the purposes of *operating, drilling and marketing the production therefrom.* (Emphasis added).

Exhibit C to Stipulation filed November 22, 1977.

3. It is especially understood and agreed by the parties hereto that Grantor's undivided interest in and to all of the oil, petroleum, gas, coal, asphalt and all other

minerals of every kind or character *in and under, and that may be produced from* the above described lands, is hereby reserved by party of the first part, *together with the right of ingress and egress at all times for the purpose of mining, drilling, and exploring* said lands for said minerals and *removing the same therefrom*, and with the rights of way, easements and servitudes for pipe lines, telephone and telegraph lines, for tanks, power houses, stations, gasoline plants and fixtures for producing, treating and caring for such products, and housing and boarding employees, and all other rights and privileges necessary, incident to, or convenient for the economical operation of the said land *for the production of said minerals*. (Emphasis added).

Exhibit D to Stipulation filed November 22, 1977.

In 1946 and 1947, *subsequent to the severance* of the surface from the oil, gas and other minerals, the *mineral interest owners* executed instruments denominated as gas storage leases in favor of Southwest Natural Gas Company. These gas storage leases were thereafter acquired by the defendant.

The gas storage lease on Tract I provided in part as follows:

WHEREAS, Second Party is desirous of obtaining a lease on the above described premises for the purpose of *introducing and storing gas in*, and extracting said gas from, any sand or formation down to a depth of 1,500 feet deemed suitable by second party for such purposes but particularly in and from what is commonly known as the Cromwell Sand found at approximate depth of 1,300 feet;

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid by second party, receipt whereof is hereby acknowledged, first party hereby grants and leases unto second party the exclusive right and privilege of *introducing and storing gas in any form and extracting and taking such gas from said sand or sands*, either through a well or wells now or to be situated on said premises, or through wells located on adjacent and surrounding premises, and for the purposes of laying pipe lines, building power stations and structures, warehouses, dwellings, telephone and telegraph lines used in conjunction with the storing and extracting of said gas, together with the right of ingress and egress, and the further right to drill any additional well or wells on said premises in such locations as deemed advisable by second party *for the purpose of introducing or extracting gas already introduced and stored*. (Emphasis added). (Defendant's Exhibit 3).

The gas storage lease on Tract II contained virtually identical language with minor differences in language being used to identify the parties (Defendant's Exhibit 4). The *surface owners did not join* in the execution of the gas storage leases.

Tract No. I is essentially the East Half of the Northeast Quarter of Section 17, Township 6 East, Range 4 North, Pontotoc County, Oklahoma, with a small piece out in the northwest corner (Plaintiff's Exhibit 2). When plaintiffs acquired Tract I there were four pipelines running across the land. Three of those pipelines run essentially north and south and almost the full length of Tract I (Tr. 7, 118, 119). Portions of at least two of those pipelines were on the surface and were visible a long time before plaintiff bought Tract I (Tr. 119). The 8″ and 4″ lines going straight to his house could be seen on the top of the ground (Tr. 132).

Plaintiff is a building contractor (Tr. 6). He has lived in this area all of his life (Tr. 18). Shortly after he acquired Tract I he built a home on his land. It is a three minute drive away from Ada (Tr. 12). He later made an addition to his home, converted his garage to an office and started a 36 foot long car port (Tr. 7). It was discovered during the construction that one of the defendant's pipelines ran beneath the corner of plaintiff's house and would also be beneath a swimming pool he proposed to build. (Tr. 7, 81, Defendant's Exhibit 5). Plaintiff immediately contacted a representative of the defendant (Tr. 7). There-

after defendant's representative Mr. Courtney came out to plaintiff's house and discussed the matter with him at length. There was some discussion concerning who should pay the cost of rerouting and relocating the lines, whether or not the defendant had any easements for the initial laying of the lines, and whether the defendant had permission to use the gas injection well, which, together with the blow pit, is located 450 or 500 feet south of plaintiffs' house (Tr. 11–12 and 81–85). As a result of these conversations, an instrument dated June 3, 1967 and signed by plaintiffs was executed and delivered by them to the defendant (Plaintiffs' Exhibit 7) and the pipeline which ran beneath the corner of their house was taken out of use insofar as the transmission of gas was concerned and the gas line was rerouted (Tr. 84–85; Defendant's Exhibit 5). The easement signed by plaintiffs grants to the defendant the right-of-way to maintain, alter, repair, operate and remove pipelines for the transportation of oil, gas or products of oil and gas on, over and through certain lands described as follows:

> The existing four (4) pipelines on the surface across part of the E/2 NE/4 Section 17–T4N–R6E, including a Gas injection well for gas storage and a pit. Relocation of approximately 450' of 8" Transmission Line # 634 across part of the North End of the E/2 NE/4 Section 17–T4N–R6E, lying East and South of dwelling.

The instrument recites that the consideration paid to plaintiffs was $5.00. The $5.00 was not in fact paid (Tr. 96–97). The defendant's cost of installing, rerouting and relocating the pipeline was $2,736.34 (Defendant's Exhibit 7; Tr. 158).

Tracts I and II are located within the confines of what is sometimes referred to as the Ada Storage Facility. (Plaintiff's Exhibits 3 and 4). The sand strata which is being used for the underground storage of gas by the defendant is the Upper Cromwell Sand. It is bounded on all four sides by an impermeable barrier of some type and thus makes a good underground gas storage reservoir (Tr. 46–47). The total

acres inside the reservoir limits are 1230; of those 1230 acres plaintiffs own approximately 78 (Tr. 49, 44 & 64). The average pay thickness of the reservoir as a whole is 100 feet with the average pay thickness in and under plaintiffs' land being 96 feet (Tr. 49; Plaintiff's Exhibit 5).

The reservoir comprising the Ada Storage Facility (the Upper Cromwell Sand) was originally a gas only producing reservoir; there was never any oil in this reservoir (Tr. 48). The reservoir was discovered as a producing gas reservoir in 1922, it produced more than 23 billion cubic feet of gas before it was depleted in 1928 (Tr. 50). "The volumes of recoverable native gas originally in place therein were depleted prior to the commencement of gas storage operations . . . ." (Findings of the Oklahoma Corporation Commission on October 3, 1973, p. 3 of Order attached as Exhibit A to Exhibit A of Plaintiff's Request for Admissions. See Tr. 75). It has been used continuously since 1949 by the defendant for underground storage of natural gas and some use was made of it as a storage facility prior to that time (Order and Journal Entry of Judgment of District Court within and for Pontotoc County, Oklahoma, filed December 16, 1975, a part of plaintiffs' request for admissions; Tr. 75). Plaintiffs' expert witness, Victor W. Pryor, testified that it had been used as an underground storage facility for approximately 50 years (Tr. 48). There are nine gas producing-injection wells in the reservoir (Plaintiffs' Exhibit 3, Tr. 49). Two of the nine injection wells are located on plaintiffs' Tract I (Plaintiffs' Ex. 3; Tr. 7) although one has been plugged (Tr. 126). A third injection well, the Balthrop # 6, is located just across the road immediately north a short distance from plaintiffs' house (Plaintiffs' Ex. 3; Tr. 11). On plaintiffs' land and south of their house 450 to 500 feet is an injection well. It is identified as WP # 3 (Plaintiffs' Ex. 2; Tr. 127). This well has been serviced by an employee of defendant once or twice a week, and oftener when the weather was cold from 1945 to the date of trial (Tr. 127, 128, 141). Plaintiff knew what the well

was being used for (Tr. 130). The WP # 3 "sticks up out of the ground there and it has a big blow pit to the west of it that takes up nearly a half acre where, when it gets water in the tank it has a huge silver tank, when they take gas out of the ground moisture comes up and catches and blows it out in the pit and the pit takes up some of it, the well takes up some of it, and then at times the cattle in the pasture, it has a big handle on it, pull it down and it blowed gas, after the fluid is all gone it blows natural gas and sometimes the cattle gets against that, it has an automatic turn-on and turn-off, and sometimes it gets hung and blows gas, and that gas smell gets real strong at times. And it would make noise, wake us up in the middle of the night and make noise. I called Mr. Scroggins if it gets hung and he would come down and fix it. The blow pit killed a few trees around there and all. I guess you expect stuff like that." (Tr. 11–12).

Although plaintiff testified that he did not know at the time he purchased Tract I that it was part of an underground gas storage reservoir (Tr. 18, 22) and that he did not learn that it was until 1967, the court finds that he in fact had both actual and constructive knowledge that Tract I was part of a gas storage reservoir at the time he bought it in 1963. Mr. Davidson, plaintiffs' grantor, told Mr. Ellis prior to his purchase of the land that he was getting the "surface only"—none of the minerals—but "because of the storage of gas . . . on the place, he would get free gas for this one house." (Tr. 120). Furthermore, the Gas Storage Lease which covered Tract I was recorded in the office of the County Clerk of Pontotoc County on February 14, 1947 (Defendant's Ex. 3) thereby giving him constructive knowledge of its terms. 16 O.S. § 16. And he had the title examined prior to purchase (Tr. 121). Moreover he described in considerable detail the gas injection well just south of his house—how it looked, how it sounded and how it smelled. Thus, although the testimony is in conflict the court finds that plaintiff knew that the land in question was being used as a gas storage reservoir.

There is no issue in this case relating to who is entitled to produce the injected gas although both sides have directed this court's attention to various cases which do involve that issue. See Hammonds v. Central Kentucky Natural Gas Co., 255 Ky. 685, 75 S.W.2d 204 (1934); Lone Star Gas Co. v. Murchison, 353 S.W.2d 870, 94 A.L.R.2d 529 (Tex.Civ.App.1962), error refused n. r. e.; White v. New York State Natural Gas Corp., 190 F.Supp. 342 (W.D.Pa.1960). Plaintiffs, as surface owners, are not asserting that they have title to or the right to drill into and produce any of the injected gas. But plaintiffs do assert that after the pore spaces in the reservoir rock have been depleted of native natural gas—and it is uncontroverted in this case that all economically recoverable gas reserves were depleted by 1928 (Tr. 50)—that they, as surface owners, own the reservoir and the void pore space in the rocks which is now being utilized by the defendant in storing natural gas produced elsewhere and injected into the reservoir. They claim in essence that their land is being used by the defendant without authority and that they are entitled to damages for its unauthorized use.

Defendants, on the other hand, deny liability and assert that because of the peculiar nature of the common law concerning ownership of natural gas in place, the ownership of the subsurface strata does not determine the right to store and recapture natural gas and that one injecting natural gas into such a stratum cannot be held to have committed a trespass. It further argues that gas storage rights were properly secured from the mineral owners by the oil and gas leases and the gas storage leases in 1928, 1946 and 1947 and that it is the mineral interest owner and not the surface owner who is empowered by law to grant storage rights to the defendant. The defendant argues that under the authority of Hammonds, supra; Central Kentucky Natural Gas Co. v. Smallwood, 252 S.W.2d 866 (Ky. 1952) and West Edmond Salt Water Disposal Association v. Rosecrans, 204 Okl. 9, 226 P.2d 965 (1950) one who reinjects gas or water into a reservoir loses ownership of

the reinjected fluid, that such fluid becomes subject to the law of capture and that because ownership is lost by virtue of reinjection, the defendant cannot be held liable for trespass or damages. The defendant especially urges *West Edmond* because it was decided by the Oklahoma Supreme Court.

There is no question, this being a diversity case, but that this court is obligated to follow state law. But in this court's view, *West Edmond* is not dispositive. *West Edmond* was concerned with the potential liability of a party who injected salt water into an underground formation, which formation was already saturated with salt water. Proof was adduced that salt water, which was injected by defendant into a well located on a 40-acre tract which adjoined plaintiffs' land to the west, was forced to the east through the porous stratum into which it was injected where it commingled with the salt water which already saturated that stratum in and under plaintiffs' land. Unlike the facts in this case, no one knew what the perimeter boundaries were of the Hoover-Tonkawa formation into which the salt water was injected. That "formation was saturated with salt water and was of great extent, the actual boundaries thereof not being capable of accurate ascertainment." 226 P.2d 965, 968. The court did find, however, that following injection of salt water into the Hoover-Tonkawa Sand, the defendants lost ownership of the injected salt water, did seem to say that minerals were *faere naturae* and did cite *Hammonds, supra,* with approval. 226 P.2d at 970–71.

The factual setting of *West Edmond* is important. There, the salt water which was injected was commingled with the salt water which already saturated the stratum in and under plaintiffs' land. The salt water was a valueless substance. No one knew what the confines or boundaries were of the formation into which the salt water was injected. In the case before this court none of those circumstances exist. There is no commingling of economically recoverable native gas and storage gas. The reservoir was depleted prior to injection. All of the gas injected is owned by the defendant. The limits of the reservoir are well defined. All of this is undisputed.

In a fact circumstance quite similar to the one which is before this court, and in declining to follow the animal *faere naturae* analogy, the court in *White, supra,* stated:

It becomes readily apparent, however, that a strict application of this analogy to the present facts is of no benefit to plaintiff's cause. To begin with, the storage gas in question has not escaped from its owners. On the contrary, it is yet very much in the possession of the storage companies, being within a well-defined storage field, the Hebron-Ellisburg Field, and being subject to the control of the storage companies through the same wells by which the gas originally had been injected into the storage pool.

190 F.Supp. 342, 348.

Looking at this same analogy, Professor Kuntz has noted:

The analogies used are imperfect and objectionable, and the result reached is reasonable only if compelled by a lack of scientific knowledge. The result is not reasonable if the character and area of the reservoir can be determined or if the specific substance can be identified and traced.

If the underground area is capable of being defined with certainty, ownership of the substances injected should not be lost, unless it appears that they have been abandoned. Further, the injector should be held to be a trespasser if the substance was intended to invade the land of another.

1 Kuntz, *The Law of Oil and Gas* § 2.6, p. 71.

██ This court's decision in this case is limited to a circumstance where the reservoir is defined and there is no commingling between economically recoverable native gas and injected gas. In this factual setting, it is my view that the law of Oklahoma is that the injector does not lose ownership of the gas by injecting it into the underground reservoir. And for these reasons I do not regard *Bezzi v. Hocker,* 370 F.2d 533 (10th Cir. 1966) as determinative in this case. *See, Lone Star Gas Co., supra.*

But the question still remains: Did the severed mineral interest owners have the legal right to grant gas storage rights to the defendant? If they did the plaintiffs cannot prevail because such rights were granted to the defendant. Professors Williams and Meyers say that in this country there "are two reported cases dealing with this matter." 1 Williams and Meyers, Oil and Gas Law, § 222, p. 328.3. A Kentucky case, *Central Kentucky Natural Gas Co. v. Smallwood,* 252 S.W.2d 866 (1952), noted in 7 Okl.L.Rev. 225 (1954) has held that the mineral interest owner has authority, to grant a gas storage lease. A West Virginia case, *Tate v. United Fuel Gas Co.,* 137 W.Va. 272, 71 S.E.2d 65 (1952) holds that the surface owner has authority to grant a gas storage lease. These two cases, looking in opposite directions, were both decided in 1952. The Court of Claims has also addressed the question more recently and has concluded that the right and power to use a depleted reservoir for gas storage purposes is vested in the surface owner. *Emeny v. United States,* 412 F.2d 1319, 188 Ct.Cl. 1024 (1969).

Writers and academicians who have looked at the question are about equally divided. Professors Williams and Meyers urge "adoption of the view that the mineral severance should be construed as granting exclusive rights to subterranean strata for all purposes relating to minerals, whether 'native' or 'injected,' absent contrary language in the instrument severing such minerals." Williams and Meyers, *supra,* at p. 333. In accord with this view, see Stamm, *Legal Problems in the Underground Storage of Natural Gas,* 36 Tex.L.Rev. 161 (1957). A contrary view is expressed by McGinnis, *Some Legal Problems in Underground Gas Storage,* Southwestern Legal Foundation, 17th Annual Institute on Oil and Gas and Taxation 23 (1966); Scott, *Underground Storage of Natural Gas: A Study of Legal Problems,* 19 Okl.L.Rev. 47 (1966); Creekmore and Harvey, *Subsurface Storage of Gas,* 39 Miss.L.J. 81 (1967).

There are several factors which should be considered in arriving at a deci-

sion concerning whether the mineral owner or the surface owner has the right and power to grant the storage right and to receive the compensation therefor. One is intention. What was the intention of the parties at the time the minerals were severed from the surface? Was it the intention that the mineral interest owner have the power to explore, develop, produce and *store* gas in and under the land in question? The first place to look in ascertaining that intention are the deeds which effect the severance. In this case it seems quite clear that the mineral severance instruments gave to the mineral interest owner all of the oil, gas and other minerals *"that may be produced";* that he had the "right of ingress and egress at all times for the purpose of *mining, drilling* and *exploring* said lands." Indeed all of the words used denote *exploration, production* and *development.* Nothing is said about *injection, storage* or *occupation.* And there is nothing before me which suggests that these rights should be reasonably inferred from other language used in the deeds.

Speaking to this same point, Mr. McGinnis has stated:

It is submitted, however, that neither the right to store nor the right to use the surface in connection with storage should be implied or presumed in the absence of clear evidence of intent to grant such rights.

McGinnis, *Some Legal Problems in Underground Gas Storage, supra,* at 51. Although Professors Williams and Meyers are of the view that the power to grant storage rights should be in the mineral interest owners, they urge this position *"absent contrary language* in the instrument severing such minerals." (Emphasis added). While the severing instruments in this case do not negate in express terms the right to inject or store gas (that is to say, they do not read "the mineral interest owner shall *not* have the power or right to inject or store gas") the only reasonable construction of the language used is that no such power is bestowed upon him. This court accordingly concludes that the parties did not intend

that the mineral interest owner should have injection, storage or occupation rights.

■ Apart from intention, if A owns a tract of land in fee simple and conveys to B all of the oil, gas and other minerals in and under and that may be produced from that tract of land, A retains everything which he did not convey. It is clear in Oklahoma that a grant of minerals simply gives to the grantee the right to explore for, produce and reduce to possession, if found, the oil, gas and other minerals. It is an incorporeal interest analogous to a profit to hunt and fish on the land of another. *Rich v. Doneghey,* 71 Okl. 204, 177 P. 86 (1918). Such a deed does not convey the minerals in place and does not convey the stratum of rock containing the pore spaces within which the oil and gas may be found. In the hard mineral area of the law and in the absence of language in the severing deed dictating a different construction, the English and Canadian rule is that the cavern which remains in the land after the hard minerals are mined is owned by the mineral interest owner; the American view is that the cavern is owned by surface owners. See *Mines and Minerals,* 54 Am.Jur.2d § 204 (1971); *Mines and Minerals* 58 C.J.S. § 162, at 338 (1948); Stamm, *Legal Problems in the Underground Storage of Natural Gas, supra,* at 168; Creekmore and Harvey, *Subsurface Storage of Gas, supra,* at 96; Lyndon, *The Legal Aspects of Underground Storage of Natural Gas,* 1 Alberta L.Rev. 543, 545 (1961). There is no reason in principle why the American rule should not apply to a depleted gas storage reservoir. Mr. Scott, in addressing himself to this question, has stated:

Based upon the foregoing principles, the surface owner alone should be compensated for the use *per se* of a stratum. He is the owner of this formation, and like an owner of a warehouse, he is entitled to the rental or other compensation paid for the use of his property.

Scott, *Underground Storage of Natural Gas: A Study of Legal Problems, supra,* at 61.

■ While the Supreme Court of Oklahoma has not passed upon this point, it has considered a closely analagous question in dealing with the rights of the mineral and surface owners which leads this court to conclude that it would hold, in the circumstances which face this court, that the surface owner has the power to convey gas storage rights. In *Sunray Oil Co. v. Cortez Oil Co.,* 188 Okl. 690, 112 P.2d 792 (1941) Cortez Oil Company was the owner of an undivided ¼ mineral interest in a tract of land. A well had been drilled by an oil and gas lessee on said land which was unproductive of oil or gas. The Cromwell Sand had been encountered and was approximately 105 feet thick; it was not productive of oil or gas and was saturated with salt water. Sunray Oil Company secured from the lessee an assignment of the oil and gas lease on the ten acres on which the well was situate. Genevieve Greer was the owner of the surface and of 53/80ths of the minerals. Sunray secured from her a license to use the well as a salt water disposal well. Cortez Oil Company sought to enjoin Sunray from so using the well. On the basis of the evidence adduced the court concluded that there was no possibility of finding oil or gas in the Cromwell Sand and hence any threat of injury to the Cortez mineral interest in that formation was purely speculative. The court then addressed the question of who had the right to grant to Sunray the right to inject and store salt water which was produced by Sunray from oil and gas wells on another lease some distance from the well in question. The court stated:

So in this case Genevieve Greer, . . . has the right to so use *the surface and substrata* of her land as she sees fit, or permit others so to do, so long as such use does not injure or damage other persons. (Emphasis added).

112 P.2d 792, 795. This court must conclude that a reasonable construction of that language is that Genevieve Greer, *as the surface owner,* was entitled to grant the salt water storage rights to Sunray. I consequently must conclude that a similar construction would be reached by that court on the evidence adduced in the trial of this case.

It is undisputed that the underground storage of natural gas as a conservation measure is one that clearly promotes the general welfare; it is a highly desirable and worthwhile undertaking in our severely energy-short economy. As a matter of policy, it is an undertaking which should be encouraged. The conclusion which the court reaches this day does not on the whole fetter or burden or make gas storage projects more difficult. If this court had concluded that it was the mineral interest owner and not the surface owner who had the power to grant storage rights, it would typically mean that hundreds of severed mineral interest owners would have to be contacted if those rights were to be obtained privately. Especially is this so if the underground gas storage reservoir was once a producing gas field. Small fractional mineral interests are typically extremely numerous on any tract of land which at some time in its history has been involved in a substantial oil and gas play. Admittedly there may be instances where, for example, the gas storage facility underlays a metropolitan area, it will be necessary to secure the consent of a large number of surface tract owners. But on the whole, that would not ordinarily be the case and there is no evidence before this court to suggest that it is the case here.

Furthermore, even if the mineral interest owner is the one who has the power to grant gas storage rights, all writers apparently agree that if there is to be "some user of the surface for injection or production wells or other surface installations" the surface owner's consent and authority must be secured in all events. Williams and Meyers, *supra,* at 331.

For all of the foregoing reasons the court concludes that the defendant did not have authorization or permission to inject and store the gas in the subsurface stratum of plaintiffs' land.

■ Defendant also argues that it acquired gas storage rights on plaintiffs' land by virtue of the easement granted on June 3, 1967 (Plaintiff's Exhibit 7). That easement granted unto the defendant the "right of way to maintain, alter, repair, operate . . . on, over and through" Tract I "the existing four pipelines on the surface . . . including a gas injection well for gas storage and a pit." There is nothing in this instrument which purports to grant gas *storage* rights as such and the court concludes that such rights are not so granted by it. Even if the mineral interest owner had the right to grant gas storage rights, it would still be necessary for defendant in this circumstance to secure permission from the surface owner to install upon the topographic surface of his land the injection well and other equipment which might be necessary to inject or withdraw natural gas. This easement granted those rights to the defendant; it granted nothing more. Williams and Meyers, *supra,* pp. 331 and 332.

■ Plaintiffs argue and allege in the amendment to their complaint that this easement "fails for lack of consideration in that the consideration cited therein has never been paid." They contend that in view of the lack of consideration the court should grant rescission of the instrument.

It is undisputed that $5.00 was not paid to plaintiff. The easement shows on its face, however, that defendant agreed to relocate some 450 feet of pipeline (see also Defendant's Exhibit 5). It is undisputed that this relocation was performed without cost to plaintiffs at a cost to defendant of $2,736.34. Plaintiffs admit in their brief of May 9, 1977 that the relocation, as set out in the instrument in question, was bargained for between the parties. They expressly state that "the only thing that was bargained for as to . . . [the June 3, 1967 instrument] is the relocation of the 450 feet of lines." However, they argue that since the only thing bargained for between the parties was the moving of the pipeline, the balance of the terms and conditions set out in the instrument are severable and should be rescinded.

The argument is without merit. The relocation was performed at substantial expense to defendant. Plaintiffs admit that this relocation was bargained for. Defendant's obligation under the "bargain" was to relocate the pipe and bear all expenses asso-

ciated therewith. It is obvious that, in exchange for defendant's promise, plaintiffs promised, as set out in the instrument, to grant defendant the right of way to maintain, alter, repair, operate and remove pipelines on plaintiffs' land, including a gas injection well for gas storage and a pit.

It is clear, therefore, that plaintiffs' promise to grant defendant the easement was supported by defendant's promise to relocate the pipeline. This constituted a bargained-for exchange, since mutual promises are consideration for the formation of a bilateral contract. 15 O.S. § 106; *Nadel v. Zeligson,* 207 Okl. 658, 662, 252 P.2d 140 (1953).

■ The defendant finally contends that it obtained by prescription the right to inject and store gas in the subsurface strata of plaintiffs' land. Plaintiff argues that this contention should not be countenanced by the court because it was not contained in the pleadings or in the pretrial order. Prior to the trial this court directed the parties to submit trial briefs and proposed findings of fact and conclusions of law. On April 5, 1977, more than three weeks in advance of trial, the defendant filed and submitted to opposing counsel his proposed findings of fact and conclusions of law. Paragraph 12 of his proposed conclusions of law was:

> Except for the fact that defendant and its predecessors were using the well for gas injection and the Upper Cromwell Sand for gas storage under *express grants* from plaintiffs and their predecessors, defendant long since *would have acquired the prescriptive right to do so, all other elements of adverse possession having been shown by the evidence.* (Emphasis added).

This court has concluded that the "grants" referred to by defendant, namely (1) the oil and gas leases, (2) the gas storage leases, and (3) the line relocation easement provide no authority in law for the defendant's underground storage of natural gas. Substantial amounts of evidence were adduced at trial directly bearing on the maturation of a prescriptive easement. Plaintiff did not suggest before the trial or object during the trial to any evidence being introduced

on the grounds that it was beyond the issues framed by the pleadings or the pretrial order. At the conclusion of the trial the court invited counsel to submit briefs on the question of whether defendant had matured a prescriptive right to store injected gas. Then, for the first time, in his brief filed on May 16, 1977, did plaintiffs object on the grounds that this issue was outside the pleadings and the pretrial order. The Court of Appeals for the Tenth Circuit has quite recently stated:

> It is the general rule that where an issue is developed in the evidence admitted without objection, the issue is before the court for determination and the pleadings should be regarded as amended to conform to the proof. See Rule 15(b) F.R. Civ.P.; *Hopkins v. Metcalf,* 435 F.2d 123, 124–25 (10th Cir.); and see Rule 16, F.R. Civ.P., governing amendment of pretrial orders.

*Sanders v. International Harvester Co.,* Case No. 76–1407 (10th Cir. 1978). The contention of plaintiffs is accordingly lacking in merit and the court will consider whether or not the defendant matured an easement by prescription for the storage of gas.

■ 60 O.S. § 333 provides as follows:
> Occupancy for the period prescribed by civil procedure, or any law of this State as sufficient to bar an action for the recovery of the property, confers a title thereto, denominated a title by prescription, which is sufficient against all.

An easement may be acquired by prescription. *Frater Oklahoma Realty Corp. v. Allen Laughon Hardware Co.,* 206 Okl. 666, 245 P.2d 1144, 1147 (1952). The burden of proof is upon the party asserting a prescriptive right and the requisite showing has been stated by the Oklahoma Supreme Court as follows:

> To obtain title to property by prescription, all elements of adverse possession must be established by clear and positive proof and cannot be established by inference. Adverse possession is to be taken strictly, and every presumption is in favor of possession in subordination to the rightful owner. The burden of proof

rests on the party asserting adverse possession to show the necessary elements of actual, adverse, open, notorious, peaceable, exclusive and hostile possession for a period of fifteen years. Where the evidence is conflicting it is an issue of fact to be determined by the trier of the facts. *Tindle v. Linville,* 512 P.2d 176, 178 (Okl. 1973). *See also Sears v. State Department of Wildlife Conservation,* 549 P.2d 1211 (Okl.1976).

■ In this case plaintiffs and their predecessors in title knew that the Upper Cromwell Sand underlying the topographic surface of the land in question was a part of the Ada Gas Storage Facility. The reservoir has been continuously used as a gas storage reservoir since 1949. There are nine injection wells on the surface of the land embraced in the storage facility. Plaintiff is a building contractor and has lived in the area all of his life. One of the principal injection wells is on his land and is located 450 to 500 feet south of his house. It has been there since before 1945. The log from this well formed the basis for the determination by the Oklahoma Corporation Commission concerning the thickness of the Upper Cromwell Sand (Plaintiffs' Ex. 5; Tr. 47). That well, according to plaintiff's testimony, with its "big blow pit" that "takes up nearly a half acre" and its "huge silver tank" is highly visible, is noisy and is smelly (Tr. 11–12). It has been serviced once or twice a week by employees of defendant from 1945 to the date of trial. Plaintiff knew what it was being used for. Some of the pipelines running from the gas reservoir were visible on the surface. The 8″ and 4″ lines going straight to plaintiff's house could be seen on top of the ground.

Plaintiffs' immediate predecessor in title was Mr. Glen D. Davidson and he had acquired title from his mother. Mr. Davidson was employed by the defendant from 1956 until 1977. He worked at the defendant's Ada warehouse just 3 miles north of Ada (Tr. 115). He and his father had a hog farm on the land where plaintiffs' house is located before plaintiff bought the land from him (Tr. 118). He was quite familiar with the land and had prepared for defendant the diagram (Defendant's Ex. 5) rerouting the pipeline around plaintiffs' house (Tr. 116). Although Mr. Davidson and his father and mother did not live on the land, they were intimately familiar with it and members of their family lived on it for several years (Tr. 118). They all knew of the pipelines and their connection with the gas storage reservoir (Tr. 118–119). Mr. Davidson, plaintiffs' grantor, told plaintiff prior to his purchase of the land that he was getting the "surface only" but *"because of the storage of gas on the place,* he would get free gas for this one house." (Tr. 120). Plaintiff also had constructive knowledge of the gas storage leases (Defendant's Exhibit 3) and had examined the title prior to purchase (Tr. 121).

Plaintiffs argue that the use by the defendant has been permissive. The record is devoid of any evidence which suggests that the plaintiffs or their predecessors in title have granted permissive use to the defendant to store gas. The plaintiff has testified, although the court has found to the contrary, that he did not know his land was being used as an underground gas storage reservoir until 1967. He objected at that time to defendant's use of the land as a gas storage reservoir. He testified as follows:

Q. And what was it that you said to him complaining about or objecting to the use of the injection well?

A. Well, I remember it very well, I said looks to me like if a man had a big warehouse and it's full of canned oil and I sold you the oil and I said, sir, this is your oil, sir you can get it out anytime you want to, he gets all of the canned oil out and I look around and he is putting oil back in there that is relatively unfair. When the gas company got out their gas out of the land it looks like this property is mine and I should be paid something for using it again. He said it's absolutely under the mineral part of it and you don't have no say-so under it. So, that's how come that is still in that easement with my name on it. (Tr. 32).

Plaintiff then went to an attorney to get an opinion on the right of the defendant to use his land as an underground gas storage reservoir but did not follow it up (Tr. 33) and although he did not formally object

again to the gas company, he "moaned and groaned and complained to everybody but an attorney," including his "friends and business acquaintances" (Tr. 33). The record is simply devoid of any evidence whatsoever that any surface owner ever gave permission to the defendant to store gas in and under this land; the only permission defendant obtained was from mineral interest owners.

■ Plaintiffs next argue that it is essential that the defendant be claiming under color of title and that it was not so claiming. This contention is totally lacking in merit. It is abundantly clear that, mistaken though the defendant was concerning who had authority to grant gas storage rights, it is and always has been claiming under the oil and gas leases, the gas storage leases and the easement it took from plaintiffs; all of these are claims under color of title.

The evidence of knowledge on the part of plaintiffs and their predecessors in title of actual, adverse, open, notorious, peaceable, exclusive and hostile possession by defendant of the Ada Gas Storage Facility for a period of time far in excess of 15 years is overwhelming. The court accordingly must conclude that defendant has matured a prescriptive easement for the underground storage of natural gas.

■ Plaintiffs also argue that the condemnation action by the defendant in the District Court of Pontotoc County against plaintiffs to condemn the Upper Cromwell Sand pursuant to state law "is in fact an admission that plaintiffs, as surface owners, own storage rights in the aforedescribed tracts. Such an admission standing alone should warrant only examination of the case on the issue of damages . . . ." (Plaintiff's Trial Brief p. 2). In effect plaintiffs argue that this action somehow bars or prevents the legal assertions which defendant makes here. This contention is not well founded. It may well be that defendant's April 1, 1976 condemnation action exhibits uncertainty concerning the state of the law on whether it is the mineral owner or the surface owner who has the power to grant gas storage leases. That

question, after all, had not been resolved in Oklahoma when that action was brought. Indeed, it stands unresolved today in most of the jurisdictions of this country. And it is essential for the effective operation of an underground gas storage reservoir for the injector to acquire the requisite authority from *all of the property interest owners in that reservoir.* But simply because the defendant took a cautious step to protect against the possibility of the very decision which this court today makes does not mean that the defendant is precluded from contending that it had gas storage rights under its gas storage leases and the other instruments of title on which it relies or that it is precluded from asserting that it has matured a prescriptive easement. The contention by plaintiffs that the institution of a condemnation action by the defendant somehow infects the validity of its arguments here is without merit.

Judgment will be entered in accordance with this Memorandum Opinion.